## AMERICAN HOME ASSURANCE COMPANY, Plaintiff,

v.

## MERCK & CO., INC., Defendant,

v.

## A.I. Marine Adjusters, Counterclaim Defendant.

No. 03 Civ. 3850 VMJCK.

United States District Court, S.D. New York.

Sept. 9, 2005.

John Nicoletti, Nooshin Namazi, Nicoletti Hornig Campise & Sweeney, New York, NY, for Plaintiff, American Home Assur. Co.

Jerold Oshinsky, Joseph F. Fields, Paul C. Sullivan, Paul O. Sullivan, Dickstein, Shapiro, Morin & Oshinsky, L.L.P. New York, NY, Anthony J. Pruzinsky, Hill, Rivkins and Hayden LLP, New York, NY, for Merck & Co., Inc.

### DECISION AND ORDER

MARRERO, District Judge.

This dispute between insurer American Home Assurance Company ("American Home"), and its insured, pharmaceutical manufacturer Merck & Co., Inc. ("Merck"), primarily concerns American Home's denial of liability for certain losses to shipments of products that Merck claims under an insurance policy bound and issued by American Home effective July 1, 2000 (the "Policy"). As described in numerous opinions that this Court and Magistrate Judge Francis have issued in the action,[1] Merck and American Home have agreed to select for review on motions for summary judgment several of the disputed claims as prototypes (hereinafter, the "Prototype Claims") in order to facilitate the settlement or more efficient litigation of remaining claims. Each of the Prototype Claims concerns finished pharmaceutical products or Active Pharmaceutical Ingredients ("APIs") that were allegedly damaged or exposed to harmful conditions during transit.

Merck and American Home have now filed cross-motions for summary judgment on several of the Prototype Claims, Merck on Prototype Claims 1–6 and American Home on Prototype Claims 1, 2 (in part), 3, and 6. Each party puts forth starkly different interpretations of the "Control of Damaged Goods" clause (the "CDG Clause") of the Policy under which Merck seeks coverage for the losses claimed in the Prototype Claims, dramatically different views of many of the facts surrounding the Prototype Claims, and widely varying interpretations of those facts.

Upon review of the parties' voluminous submissions in this matter, the Court concludes that while it may develop a definitive interpretation of the CDG Clause and other relevant contractual provisions at this stage of the litigation, the Court cannot determine as a matter of law whether or to what extent Merck is entitled to coverage under the CDG Clause for any of the losses claimed in Prototype Claims 1–6. Consequently, it grants in part the parties' cross-motions for summary judgment and denies them in part.

### I. BACKGROUND[2]

#### A. THE POLICY

The CDG Clause under which Merck claims coverage for Prototype Claims 1–6 states as follows:

---

1. *See, e.g., American Home Assurance Co. v. Merck & Co.*, 329 F.Supp.2d 436 (S.D.N.Y. 2004) (*"American Home I"*); *American Home Assurance Co. v. Merck & Co.*, 354 F.Supp.2d 318, 319 n. 1 (S.D.N.Y.2005) (collecting additional citations).

2. The following factual summary derives from the following documents: Plaintiff American Home Assurance Company's Local Civil Rule 56.1 Statement, dated Mar. 18, 2005 ("American Home Rule 56.1(a) Statement"); Merck & Co., Inc's Local Rule 56.1(a) Statement, dated Mar. 18, 2005 ("Merck Rule 56.1(a) Statement"); Plaintiff American Home Assurance Company's Local Civil Rule 56.1 Coun-

ter–Statement in Opposition to Merck & Co., Inc.'s Statement of Material Facts, dated Apr. 18, 2005 ("American Home Rule 56.1(b) Statement"); Merck & Co., Inc's Local Rule 56.1(b) Statement, dated Apr. 18, 2005 ("Merck Rule 56.1(b) Statement"); Plaintiff American Home Assurance Company's Local Civil Rule 56.1 Counter–Statement in Opposition to Merck & Co., Inc's Local Rule 56.1(b) Statement, dated June 3, 2005 ("American Home Rule 56.1 Counterstatement"); Worldwide Transit Policy No. 87733, attached as Ex. 4 to Merck Local Rule 56.1(a) Statement (the "Policy"); and from expert affidavits, deposition transcripts, and additional documents cited therein. Except where specifical-

The Assured [*i.e.*, Merck] shall have full right to the possession of all goods involved in any loss under this policy and shall retain control of all damaged goods. The Assured, exercising a reasonable discretion, shall be the sole judge as to whether the goods involved in any loss under this policy are fit for use as originally intended or in any other capacity, and no goods so deemed by unfit for use shall be sold or otherwise disposed of except by the Assured or with the Assured's consent, but the Assured shall allow this Company [*i.e.*, American Home] any salvage obtained by the Assured on any sale or other disposition of such goods.

In addition, property insured by this policy shall be deemed to have suffered an insured loss if, as a result of a fortuitous event:

Said property is deemed unfit for use by any government regulatory body and/or agency, anywhere in the world, or as a result of reasonable interpretation of regulations promulgated by said bodies and/or agencies;

or

the only means of determining the existence or extent of damage is through "destructive testing."

(Policy at 10.) Neither of the parties claims that coverage is available to Merck under the first paragraph of the CDG Clause. Moreover, no "government regulatory body and/or agency" has actually deemed "unfit for use" any of the pharmaceutical products that are the subject of Prototype Claims 1–6. Merck instead asserts that the Prototype Claims are covered under an interpretation of the CDG Clause that would insure Merck "if, as a result of a fortuitous event: Said property is deemed unfit for use" as a result of *its* "reasonable interpretation of regulations promulgated by said [government regula-

tory] bodies and/or agencies." In the alternative, Merck argues that it is entitled to coverage under the "destructive testing" provision of the CDG Clause. American Home, while acknowledging that coverage is available to Merck under the CDG Clause, disputes Merck's proffered interpretation of the clause.

Unlike the parties' dispute over the interpretation of the valuation clause of the Policy, in which each side put forth facts supporting the conclusion that its interpretation of the clause was proper, *see American Home Assurance Co. v. Merck & Co., Inc.*, No. 03 Civ. 3850, 2005 WL 1153723 (S.D.N.Y. Apr.13, 2005) (*"American Home R & R"*), the parties' dispute over the CDG Clause is not informed by substantial factual evidence. The parties instead rely on various interpretive guides available under Pennsylvania law, which governs this action, *see id.*, to assist the Court in developing a proper interpretation of the CDG Clause.

The Court also must interpret the "Sue and Labor" Clause ("Sue and Labor Clause") of the Policy. The clause states as follows:

In case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants, and assigns, to sue, labor and travel for, in and about the defense, safeguard, and recovery of the said goods and merchandise, or any part hereof, without prejudice to this insurance; to the charges whereof, this Company will contribute according to the rate and quantity of the sum hereby insured; nor shall the acts of the Assured or this Company, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment.

ly referenced, no further citation to these sources will be made.

(Policy at 7.) American Home argues that Merck violated its obligations under this clause, which is of ancient origin,[3] to salvage the pharmaceuticals that are the subjects of the Prototype Claims. The parties present no extrinsic evidence to aid the Court in interpreting this provision.

## B. *THE PROTOTYPE CLAIMS*

### 1. *Prototype Claim 1*

In Prototype Claim 1, Merck seeks insurance coverage under the CDG Clause for losses allegedly sustained to a shipment of the Merck vaccines VAQTA, COMVAX, and thimoserol-free RECOMBIVAX (collectively, the "Vaccines"), which are used to protect recipients from various forms of hepatitis.[4] The federal Food and Drug Administration ("FDA"), which regulates all of the products that are the subjects of the Prototype Claims, licensed Merck to sell the Vaccines subject to certain conditions. These conditions included the requirement that Merck distribute along with the Vaccines product circulars that direct purchasers to store the Vaccines at 2–8 Celsius ("C"), and state, with varying levels of emphasis, "do not freeze since freezing destroys potency."

The shipment at issue in Prototype Claim 1 departed from Merck's West Point, Pennsylvania facility in a refrigerated truck owned by independent trucking company Prime, Inc. ("Prime"), for delivery to a Merck distribution facility in Reno, Nevada. The bill of lading for the shipment directed Prime to maintain the set point of the refrigeration unit inside the truck at 42 Fahrenheit ("F"), which corresponds to a temperature of 5.5 C.[5] Merck placed a TempTale3 ("TempTale") temperature monitor inside the truck to ensure that the proper temperatures for the vaccines were maintained. Merck has introduced evidence indicating that the accuracy of the TempTale unit was validated by its manufacturer, Sensitech Inc. ("Sensitech"), both before and after the shipment. (*See* Merck Rule 56.1(a) Statement ¶¶ 35–36.) Several other temperature measures were taken throughout the truck's journey to Reno. The ThermoKing refrigeration unit that cooled the Vaccines were located throughout the truck contained two gauges that recorded ambient temperatures; a Qualcomm Communications remote satellite data acquisition system (the "Qualcomm system") recorded ambient temperatures within the truck and sent them via satellite to Prime's offices, and the drivers of the truck allegedly recorded temperatures within the truck on a log book, using a readout on the ThermoKing refrigeration unit.

While the parties strongly dispute the accuracy and significance of the various temperature measurements taken during the course of the trip, it is undisputed that the TempTale and at least one of the ThermoKing temperature sensors recorded temperatures at or below 0 C

---

**3.** The Fifth Circuit has noted that "[t]he clause is an ancient one," having been inserted into marine insurance policies at least since 1613. *Reliance Ins. Co. v. Escapade,* 280 F.2d 482, 488 n. 11 (5th Cir.1960). *See generally* J.P. Ludington, *Construction and Effect of "Sue and Labor" Clause of Marine Policy,* 86 A.L.R.2d 1247 (discussing origins and purpose of the clause).

**4.** American Home asserts that Merck also seeks coverage for a diluent and for capsules of syprine, another Merck-manufactured drug, that were shipped along with the Vaccines, but Merck insists that "it does not claim for either the syprine capsules or the diluent on board the May 10–13, 2002 shipment in issue." (Merck Rule 56.1(b) Statement ¶ 247.)

**5.** The bill of lading directed Prime to "MAINTAIN 42 ." and "INFORM MERCK ASAP ... IF TEMP GOES OUT OF RANGE DURING TRANSIT!" (Merck Rule 56.1(a) Statement ¶¶ 22, 25.)

(32 F) for approximately 2.5 hours while the truck was in transit.[6] For at least one hour of that time, the two sensors recorded temperatures below 31.1 F, which Merck asserts is the freezing point of the Vaccines. The remaining temperature gauges recorded above-freezing temperatures throughout the trip, and the remaining measurements on the TempTale and the ThermoKing sensor registered temperatures that were above freezing.

After the shipment was received in Reno, Merck reviewed the readouts from the various temperature gauges on the truck and determined that the vaccines were unfit for use due to the possibility that they had frozen in transit. Merck claimed that the goods could not be sold pursuant to its reasonable interpretation of an FDA regulation, 21 C.F.R. § 211.208 ("Section 211.208"), which states in its entirety as follows:

> Drug products that have been subjected to improper storage conditions including extremes in temperature, humidity, smoke, fumes, pressure, age, or radiation due to natural disasters, fires, accidents, or equipment failures shall not be salvaged and returned to the marketplace. Whenever there is a question whether drug products have been subjected to such conditions, salvaging operations may be conducted only if there is (a) evidence from laboratory tests and assays (including animal feeding studies where applicable) that the drug products meet all applicable standards of identity, strength, quality, and purity and (b) evidence from inspection of the premises that the drug products and their associated packaging were not subjected to improper storage conditions as a result of the disaster or accident. Organoleptic examinations shall be acceptable only as supplemental evidence that the drug products meet appropriate standards of identity, strength, quality, and purity. Records including name, lot number, and disposition shall be maintained for drug products subject to this section.

Accordingly, Merck sought coverage under the CDG Clause of the Policy for the full (and substantial) market value of the Vaccines. American Home subsequently denied the claim.

In its submissions to the Court on the instant motions, American Home strongly disputes the validity of Merck's claim for coverage. American Home first argues that Section 211.208 does not apply to the Vaccines. Next, it claim s that even if

---

**6.** The TempTale machine that recorded the below-freezing temperatures was recycled for parts by Sensitech, Inc. ("Sensitech"), the instrument's manufacturer, shortly after its accuracy was certified by Sensitech. American Home did not independently assess the instrument's accuracy before it was recycled, and it claims that as a consequence Merck should be sanctioned for spoliation of evidence by excluding the TempTale's results from consideration on summary judgment. The Court rejects this argument. Merck did not direct Sensitech to destroy the TempTale, had no custody or control over the TempTale, and had not been notified by American Home that Prototype Claim 1 would be the subject of litigation at the time the unit was destroyed. Absent evidence that Merck directed Sensitech to recycle the TempTale in order to avoid giving American Home the opportunity to examine it, American Home cannot demonstrate spoliation, which requires proof of "an intentional attempt to destroy evidence." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir.2001). Moreover, American Home had the opportunity to request, or seek a court order requiring, Sensitech to preserve the TempTale unit so that it might be independently examined by American Home, but it failed to do so before Sensitech recycled the unit. Courts have declined to find spoliation under analogous circumstances. *See id.* (affirming denial of spoliation sanctions where party seeking sanctions had failed to seek timely access to the destroyed material).

Section 211.208 did apply to the shipment, the Vaccines could not have frozen during transit. It notes that several of the temperature gauges recorded above-freezing temperatures throughout the trip, that a test performed on the truck after the shipment did not record freezing temperatures within the truck, and that the accuracy of the gauges that did record below-freezing temperatures cannot be assured. It also claims that even if the readouts of the TempTale and the ThermoKing gauges were accurate, the Vaccines could not have frozen because they were packed in insulated containers and were not exposed to sufficiently cold temperatures for a sufficiently long period of time to have actually frozen.[7]

American Home further disputes that Section 211.208 would require Merck to destroy all of the Vaccines even if the below-freezing temperature readings created the possibility that some or all of the Vaccines may have frozen. It argues that at most, the alleged temperature excursion acted to create "a question whether drug products have been subjected to [improper storage] conditions." 21 C.F.R. § 211.208. According to American Home, under these circumstances Merck should have, pursuant to its duty to protect and preserve property under the Policy, conducted "salvaging operations" in order to return the Vaccines to the market upon proof that they met "all applicable standards of identity, strength, quality, and purity." *Id.* American Home claims that Merck violated its duty to mitigate by failing to make any effort to salvage the Vaccines.

### 2. *The Fiberboard Drum Claims*

In Prototype Claims 2, 4, 5, and 6 (collectively, the "API Claims"), Merck has sought coverage for damage allegedly sustained to fiberboard drums of two active pharmaceutical ingredients ("APIs"), alendronate sodium ("AS") and rofecoxib, during various international air shipments.

Prototype Claim 2 involves a March 9, 2002 shipment of twenty-nine cylindrical fiberboard drums of AS from Merck's facility in Ireland to its facility in Puerto Rico. To prepare each of the drums for shipment, the AS was packed in double-lined polyethylene bags, each of which was separately tied, and then placed in the drum. The drum was then closed with a plastic lid. According to Merck, this packing method represents a standard method for transporting APIs. (*See* Merck Rule 56.1(a) Statement ¶ 108.) Merck has presented documents indicating that each of the drums was certified as being in perfect condition when it left Merck's Ireland facility.

The drums arrived at New York's JFK airport en route from Ireland to Puerto Rico. According to Aer Lingus Cargo, the entity responsible for shipping the drums involved in Prototype Claim 2 from Ireland to New York, a pallet containing a portion of the shipment was dropped while at JFK. On March 12, 2002, Merck's freight forwarder examined the shipment in New York and noted that two of the drums, drums 21 and 23, had been damaged. Merck ordered that the two damaged drums be quarantined and that the remaining twenty-seven drums be sent on to Puerto Rico. Two additional fiberboard drums, drums 8 and 17, were identified as being damaged upon their arrival in Puerto Rico. All four of the damaged drums were eventually shipped back to Ireland for further inspection. The inspections re-

---

7. American Home also argues in the alternative that at most, only the vials on the outer layer of the insulated packaging in which the Vaccines were shipped could have frozen during the short period of time during which the temperature in the truck dipped below freezing. (*See, e.g.,* American Home Rule 56.1(a) Statement ¶ 279.)

vealed that in drums 8 and 17, the polyethylene liners appeared to have been breached, with AS leaking out of the liners into the fiberboard barrels. In drums 21 and 23, however, there was no evidence that the polyethylene liners were breached; Merck employees and other inspectors observed no spillage of AS powder either inside or outside the fiberboard drums. It thus appeared that the AS was exposed to the environment in only two of the damaged drums, even if the fiberboard protecting the AS in each of the four drums had sustained damage. Nonetheless, Merck subsequently sought coverage under the CDG Clause for all four of the drums, claiming that under its reasonable interpretation of Section 211.208, the AS within each of the damaged barrels had "been subjected to improper storage conditions." 21 C.F.R. § 211.208. It conducted no tests or other evaluation of the AS contained within the four drums to determine whether the AS could be salvaged, in whole or in part.

American Home, in its submissions to the Court, does not seek summary judgment with respect to drums 8 and 17, apparently recognizing that there is, at minimum, a genuine issue of material fact concerning whether Merck would be required to destroy the AS remaining in those drums after the polyethylene liners protecting the AS from the environment had been breached. It does, however, resist Merck's summary judgment motion with respect to those drums by arguing that Section 211.208 does not apply to APIs, and that Merck breached its duties to mitigate damages, and to sue and labor to minimize losses covered under the Policy, when it failed to take any steps to determine whether the AS remaining in drums 8 and 17 could be salvaged. It further argues, on behalf of its own motion for summary judgment with respect to drums 21 and 23, that even if Section 211.208 did apply to Prototype Claim 2 (an assertion it vigorously disputes), Merck cannot even establish that there was a question whether the drug products contained within the drums were "subjected to improper storage conditions" in the first instance. Absent evidence that the AS *may have* been exposed to environmental contamination, American Home argues, Merck cannot argue that its claim to coverage under the CDG Clause is a reasonable one.

The remaining Prototype Claims concerning fiberboard drum shipments involve similar fact patterns and arguments. Prototype Claim 4 involves a shipment by air and truck of thirty one drums of rofecoxib from Merck's Singapore subsidiary to its Puerto Rico subsidiary, via Miami International Airport. As with the AS drums, the rofecoxib was packed in double-lined polyethylene bags, then placed in fiberboard drums. Merck has presented evidence indicating that the drums were all in good condition when they departed Singapore, but that one of the thirty-one drums was found to have been damaged upon its arrival at Merck's Puerto Rico facility. When a claims adjuster visited the facility to examine the drum, he was able to see that the drum had been cut on its side. Upon inserting a ballpoint pen into the cut, the adjuster noted that the pen, "when withdrawn, was found to be coated with a white pharmaceutical powder, confirming that the polyethylene liners are punctured." (Merck Rule 56.1(a) Statement ¶ 202.) Again, as with the drums in Prototype Claim 2 that had experienced breaches in their polyethylene liners, Merck claimed that it was required to destroy the drum pursuant to Section 211.208. American Home contests summary judgment on this claim in part by arguing that Merck failed to take reasonable steps to determine whether any of the rofecoxib in the damaged drum could have been salvaged.

Prototype Claim 5 involves another shipment of rofecoxib from Merck's Singapore subsidiary to its Puerto Rico subsidiary. This shipment, which departed from Singapore on or about April 8, 2002, was verified by Merck as being in good condition before its departure. As with Prototype Claim 4, one of the drums in the shipment was found to have been punctured upon its arrival in Merck's Puerto Rico warehouse. A claims adjuster verified that the polyethylene liners had also been punctured, and that rofecoxib was leaking out of the drum.

Prototype Claim 6 involves another shipment of AS from Merck's Ireland subsidiary, this one intended for a third-party customer in Japan. Two drums of AS were included in the shipment. The drums were in good condition when they left Merck's facility on June 19, 2003. Before the drums left Ireland for Japan, however, one was damaged by an employee of Merck's freight forwarder. A claims adjuster's inspection of the damaged drum found that the fiberboard was impacted and cracked, but that the polyethylene liners had suffered no physical damage, and no AS was leaking out of the drum. As with drums 21 and 23 of Prototype Claim 2, Merck nonetheless determined that it was required to destroy the drum pursuant to Section 211.208.

### 3. *Prototype Claim 3*

Prototype Claim 3 involves a shipment of various Merck pharmaceuticals that were loaded onto an American Freightways ("Freightways") truck traveling from Maryland to Merck's customer, Amerisource, in Indiana. The pharmaceuticals loaded onto the truck were already packaged for sale, either in plastic bottles with tamper-evident seals or in blister packs. That packaging was placed in secondary packaging, which was then palletized and shrink-wrapped before being placed into the Freightways truck.

■ Freightways, however, also mistakenly loaded seven cylinders that had allegedly contained chlorine gas onto the truck before it left from Maryland on its way to Indiana. It appears undisputed that this act violated United States Department of Transportation ("DOT") regulations prohibiting the shipment of hazardous materials such as chlorine in the same motor vehicle with materials intended for human consumption unless stringent conditions are met.[8] When informed by Freightways of this error, Merck stopped the shipment short of its customer, Amerisource, and had it returned to a Merck facility in New Jersey for inspection. According to a Merck employee, Samuel Bexon ("Bexon"), who inspected the truck upon its return to Merck's New Jersey facility, the interior of the truck exuded no smell of chlorine, and all of the drugs shipment "was in good order." Moreover, Merck never tested the chlorine gas canisters to determine if they still contained any chlorine or were emitting chlorine gas. Nor did Merck examine or test the pallets of pharmaceuticals to determine whether even the outer packaging of the drugs had been exposed to chlorine. Nonetheless, Merck determined that the pharmaceuticals were "subjected to improper storage conditions" and had to be destroyed pursuant to Section 211.208.

---

8. Merck's Rule 56.1(a) Statement and Memorandum of Law assert that the joint shipment violated 49 C.F.R. § 173.115 (*see* Merck Rule 56.1(a) Statement ¶ 240; Merck Mem. at 31), but that regulation merely supplies definitions for various types of hazardous materials. It appears instead that the joint shipment violated 49 C.F.R. § 177.841(e), which directly regulates joint shipment of hazardous materials and materials intended for human consumption and which was cited by Melanie McCollum ("McCollum"), Merck's manager of hazardous materials compliance, in an e-mail asserting that the shipment violated DOT regulations. (*See* Merck Rule 56.1(a) Statement ¶ 245).

Merck, in the alternative, asserted it could not demonstrate that the drugs were *not* subjected to improper storage conditions, and that therefore, the drugs could not be salvaged pursuant to Section 211.208. Merck destroyed the drugs at issue in Prototype Claim 3 in June 2002, pursuant to its ordinary business practices.[9]

## II. *DISCUSSION*

### A. *SUMMARY JUDGMENT STANDARD*

 The Court may not grant summary judgment "unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Island Software and Computer Service, Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir.2005) (citing Fed.R.Civ.P. 56(c)). In determining whether any genuine issues of material fact exist that would preclude summary judgment, the Court must "draw all permissible inferences in favor of the non-moving party." *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir.2005). The Court does not, however, defer to a party's legal arguments on summary judgment; "with respect to a motion for summary judgment, questions of law are for the court." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 534 (2d Cir.1993).

### B. *INTERPRETATION OF POLICY PROVISIONS*

#### 1. *Principles Governing Contract Interpretation*

 The Court has earlier determined that Pennsylvania law governs the contract claims in this diversity action. *See American Home I*, 329 F.Supp.2d at 445. As the Pennsylvania Supreme Court recently stated, under Pennsylvania law, "the interpretation of an insurance contract is a question of law." *401 Fourth Street, Inc. v. Investors Ins. Group*, 879 A.2d 166, 170 (Pa. 2005). The task of a court seeking to interpret an insurance contract "is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id.* at 171. Normally, any ambiguities in an insurance contract are to be construed against the insurer, *see id.*, but this maxim does not apply where, as here, "large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy." *American Home R & R*, 2005 WL 1153723, at *8 (quoting *First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Insurance Co.*, 803 F.2d 1308, 1311–12 (3d Cir.1986)), and where Merck itself may have supplied some of the critical language in the Policy.

 As the Court noted in *American Home R & R*: "[i]n interpreting an insurance policy, '[w]here the language of the policy is clear and unambiguous, a court is required to give effect to that language.'" *Id.* at *4 (quoting *Progressive Northern Insurance Co. v. Schneck*, 572 Pa. 216, 221, 813 A.2d 828, 831 (2002)). Where an insurance contract is ambiguous, however, and that ambiguity is not strictly construed against the insurer, "'irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances,' parol evidence is admissible to clarify or resolve the ambiguity." *Id.* (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 498, 854 A.2d 425, 437 (2004)).

---

**9.** The Court also rejects American Home's request for spoliation sanctions related to the destruction of the drugs. As with the Temp-Tale, there is no evidence that Merck's destruction of the drugs, which occurred a full year before American Home filed suit, represented "an intentional attempt to destroy evidence." *Fujitsu*, 247 F.3d at 436. Moreover, American Home was given sufficient opportunity to inspect the drugs before they were destroyed to negate any spoliation claim. *See id.*

### 2. *The CDG Clause*

The Court concludes initially that it may interpret the language of the CDG Clause without resort to parol evidence. Unlike the dispute over the proper interpretation of the Policy's valuation clause, which was informed by conflicting parol evidence related to the parties' understanding of, and practices under, the clause, the parties offer little external evidence that would shed light on the meaning of the CDG Clause. American Home does offer evidence that Merck's broker, Aon Insurance, initially proposed a variant of the CDG Clause, which was called the "Control of Merchandise" clause, that would have provided Merck with more expansive coverage than that provided by the CDG Clause.[10] That proposed language was rejected by potential insurers, and the current language of the CDG Clause, which had existed in a prior insurance policy purchased by Merck, was retained in the Policy. But American Home's evidence proves only that insurers were unwilling to provide more generous terms of coverage to Merck. It does nothing to explain how the policy *actually issued* by American Home to Merck should be interpreted. Merck itself offers no parol evidence directly relevant to the proper interpretation of the CDG Clause.

Consequently, the Court will proceed to examine each of the elements of the CDG Clause to ascertain its meaning. The Court first notes that the initial paragraph of the CDG Clause does not provide Merck with additional coverage under the Policy. Rather, it ensures that Merck will retain control of any goods "involved in any loss under this policy" (Policy at 10), *i.e.,* damaged goods. The initial paragraph also unambiguously allows Merck to "be the sole judge as to whether the goods involved in any loss ... are fit for use." *Id.* However, it requires Merck's exercise of discretion under this provision of the clause to be "reasonable." *Id.* Finally, the first paragraph requires Merck to pay American Home "any salvage" it obtains "on any sale or other disposition" of the goods that are "involved in any loss under this policy." *Id.* The parties do not dispute the interpretation of this paragraph.

As American Home acknowledges, the remainder of the CDG Clause unambiguously expands Merck's coverage under the Policy. The parties put forward substantially different versions of several of the terms within this section of the clause, as well as the proper interpretation of the section as a whole. The Court first examines the "fortuitous event" requirement of the clause. It is clear that a "fortuitous event" is required to trigger coverage under this section of the CDG Clause, but the term is undefined by the Policy.[11] The Court concludes that the term means a loss of a type that was not "expected or intended." *See Koppers,* 98 F.3d at 1447–48 (agreeing with appellant's contention that the "fortuitous event" requirement

---

**10.** The proposed clause would have granted Merck "sole discretion in determining the extent of loss as well as the suitability of any property for use as originally intended, or in any other capacity." (American Home Rule 56.1(a) Statement ¶ 34.)

**11.** The CDG Clause indicates that the additional coverage provided by this portion of the policy will be triggered only if certain circumstances are created "as a result of a fortuitous event." (Policy at 10.) The Court notes that

even if the "fortuitous event" requirement had not been contained in the CDG Clause, it would need to be inserted as an implied term on public policy grounds. *See Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1446–47 (3d Cir.1996) (predicting that "the Pennsylvania Supreme Court would recognize 'a judicially created "fortuity" exclusion from coverage' ... [on a] 'public policy' basis") (quoting *Intermetal Mexicana v. Insurance Co. of N. Am.,* 866 F.2d 71, 72 (3d Cir.1989)).

imposed by Pennsylvania law excludes coverage "if the insured expected or intended a harm *of the same general type* as the harm that occurred") (emphasis added).

The next portion of the clause states that coverage is triggered if the fortuitous event causes property covered by the Policy to be "deemed unfit for use by any government regulatory body and/or agency, anywhere in the world." (Policy at 10.) The parties do not dispute that coverage under this provision of the clause is not triggered unless a regulatory body or agency actually deems the property "unfit for use." None of the pharmaceuticals comprising the Prototype Claims were actually deemed unfit for use by any governmental authority; consequently, coverage cannot be available under this provision of the CDG Clause.

■ The next provision of the clause, however, does constitute a potential basis for Merck's claims of coverage. The Court concludes that coverage under this provision is triggered when property "is deemed unfit for use" by *Merck* as a result of Merck's own "reasonable interpretation of regulations promulgated by ... [government regulatory] bodies and/or agencies." There is no entity other than Merck that the CDG Clause could have contemplated as the party which would determine whether governmental regulations would require destruction of property covered by the Policy: no third party is given responsibility in the Policy for interpreting regulatory mandates, and it would make no sense for the parties to have implicitly charged American Home, the insurer, with interpreting FDA regulations when Merck, the insured, is intimately familiar with the FDA's regulatory requirements. Consequently, coverage under this provision of the CDG Clause is triggered if Merck reasonably interpreted Section 211.208 to require Merck to declare the pharmaceuti-

cals that are the subjects of the Prototype Claims "unfit for use."

This interpretation of the phrase is not, as American Home appears to contend, an improper "fear of loss" provision. Rather, the provision acknowledges that the FDA regime governing the manufacture and sale of pharmaceuticals is intended to be largely self-regulatory. Neither of the parties suggests that Merck was required to, or even should have, presented the pharmaceuticals involved in the Prototype Claims to the FDA for it to determine whether the pharmaceuticals were fit for use. Nor could Merck have pressed onward with an attempt to manufacture or sell drugs that it reasonably believed were unfit for use under FDA regulations, given the actual danger to public health that might be caused by such manufacture or sale *and* the severe consequences that Merck would suffer if the FDA later determined that Merck had attempted to manufacture or sell adulterated products. Thus, the provision is intended to acknowledge that Merck itself may need to determine whether it may be permitted to manufacture or sell pharmaceutical products based on its own "reasonable interpretation of regulations promulgated by" the FDA, among other regulatory authorities.

■ The Court disagrees with Merck's proposed interpretation of the final element of the CDG Clause, which provides for coverage where "the only means of determining the existence or extent of damage is through 'destructive testing.'" (Policy at 10.) While Merck may be correct that "destructive testing" should be defined as "the physical testing of tangible objects such that the testing involves the alteration or partial destruction of the object" (Merck Opp. Mem. at 31) (quoting *Shimanovsky v. Gen. Motors Corp.*, 181 Ill.2d 112, 229 Ill.Dec. 513, 692 N.E.2d 286, 289 (1998)), Merck alleges that under this definition it would be entitled to coverage

for an *entire shipment* of pharmaceuticals if even a portion of that shipment would need to undergo destructive testing to determine the remainder's fitness for use. Thus, Merck claims that it would be entitled to coverage for the entire shipment of vaccines in Prototype Claim 1 if "at least a sample portion of the drugs would need to be destroyed through testing to determine the existence or extent of damage to the drugs as a whole." (*Id.* at 32.)

That interpretation of the "destructive testing" provision of the clause is not only contrary to the definition proffered by Merck itself, but would lead to unacceptable results. Under the definition stated in *Shimanovsky,* Merck would be entitled to coverage for *those objects* that would need to be altered or partially (or fully) destroyed in order to ascertain the existence or extent of damage to property covered by the Policy. If, for example, Merck would need to test a sample of the vaccines involved in Prototype Claim 1—and by testing, presumably alter or destroy that sample—to determine whether the entire shipment of vaccines was fit for use, Merck would be entitled to coverage under the "destructive testing" provision for the value of the *sample* that would need to be destroyed to determine the remainder of the shipment's fitness for use. As the Court has previously stated, the Policy is a policy of indemnity intended to cover actual losses, not to provide Merck with a windfall. *See American Home Assur. Co. v. Merck & Co., Inc.* 376 F.Supp.2d 469, 470 (S.D.N.Y.2005). Merck's proffered interpretation of the provision would violate this principle by enabling it to get full coverage for a shipment of pharmaceuticals even if destructive testing of a sample of the shipment would reveal that the remainder of the shipment was fit for use and thus, absent any applicable prohibition, presumably could be sold.

### 3. Burdens of Proof: Coverage and Affirmative Defenses

 The Court must also determine who bears the burden of proof in this matter, particularly as it relates to American Home's argument that Merck violated the Sue and Labor Clause of the Policy or Merck's duty to mitigate damages. As *Koppers* states:

> In Pennsylvania, the insured bears the burden of proving facts that bring its claim within the policy's affirmative grant of coverage. By contrast, the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense.

98 F.3d at 1446. Thus, Merck will be required to prove that it is entitled to coverage for some or all of the losses claimed in each of the Prototype Claims. As applied to Merck's burden with respect to the Prototype Claims, Merck will be entitled to coverage if it proves that, as a result of a fortuitous event, it was required to declare each of the subjects of the Prototype Claims unfit for use under a reasonable interpretation of Section 211.208.[12]

---

12. Merck also argues in its opposition papers, but not in its initial motion for summary judgment or its reply brief, that at least some of the Prototype Claims would be deemed unfit for use under a reasonable interpretation of 21 C.F.R. § 211.204 ("Section 211.204"). That regulation, governing returned drug products, closely tracks the requirements of Section 211.208, except that it does not explicitly state that drugs subjected to improper holding, storage, or shipping conditions *must* be destroyed even if they meet all applicable standards of "safety, identity, strength, quality, or purity":

> If the conditions under which returned drug products have been held, stored, or shipped before or during their return, or if the condition of the drug product, its container, carton, or labeling, as a result of storage or shipping, casts doubt on the safety, identity, strength, quality or purity of the

In order to satisfy this requirement, Merck must first establish that it reasonably determined that the provisions of Section 211.208 apply to each of the Prototype Claims.

If a Prototype Claim satisfies this requirement, the language of Section 211.208 sets forth two conditions under which Merck would satisfy its burden of proving that the claim falls "within the [P]olicy's affirmative grant of coverage." *Koppers*, 98 F.3d at 1446. First, if Merck reasonably concludes that the pharmaceuticals involved in a Prototype Claim were "subjected to improper storage conditions," as that phrase is defined by 21 C.F.R. § 211.208, that provision would require Merck to declare those pharmaceuticals unfit for use, and Merck would thus fall within the CDG Clause's affirmative grant of coverage. Second, if Merck reasonably concludes that "there is a question whether" the pharmaceuticals were "subjected to such [improper storage] conditions," *id.*, then Section 211.208 would prohibit Merck from returning the drugs to the marketplace unless it produced:

(a) evidence from laboratory tests and assays (including animal feeding studies where applicable) that the drug products meet all applicable standards of identity, strength, quality, and purity and (b) evidence from inspection of the premises that the drug products and their associated packaging were not subjected to improper storage conditions as a result of the disaster or accident.

*Id.* It is undisputed that the parties did not satisfy even the first of these conditions with respect to any of the Prototype Claims, having failed to perform any tests or other investigations that may have demonstrated whether the claimed pharmaceuticals met "applicable standards of identity, strength, quality, and purity." *Id.* Thus, Merck would be required by Section 211.208 to declare each of the Prototype Claims unfit for use even if it reasonably concluded that the propriety of storage conditions for the drugs was merely called into question. Under this prospect as well, Merck would have satisfied its initial burden of showing that the Prototype Claim falls within the CDG Clause's affirmative grant of coverage.

 This step does not represent the end of the matter, however. Assuming Merck satisfies this initial burden of demonstrating coverage under the Policy with respect to each of the Prototype Claims, American Home may still reduce or avoid liability under the Policy if it proves that Merck failed to mitigate damages or violated its obligations under the Sue and Labor Clause. Turning first to Merck's duty to mitigate, the Court concludes that Pennsylvania law establishes an insured's "duty to mitigate [that] arises upon the defendant's breach of the contract." *Koppers*, 98 F.3d at 1448. The insurer bears the burden of demonstrating an insured's failure to mitigate, which requires proof of: "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced." *Id.*

---

drug product, the returned drug product shall be destroyed unless examination, testing, or other investigations prove the drug product meets appropriate standards of safety, identity, strength, quality, or purity. A drug product may be reprocessed provided the subsequent drug product meets appropriate standards, specifications, and characteristics.

*Id.* Because Merck has introduced enough evidence that Section 211.208 covers each of the Prototype Claims to survive summary judgment, the Court does not examine at this stage of the proceedings whether Merck would also be entitled to coverage for some of the claims under a reasonable interpretation of Section 211.204.

American Home may not be able to demonstrate that Merck failed to mitigate damages, either because Merck's alleged failure to salvage the Prototype Claims was irreversible even before American Home denied coverage for the claims, and thus before Merck's duty to mitigate could have arisen, or due to problems of proof associated with the affirmative defense. Nonetheless, American Home may be able to prove that Merck is not entitled to coverage under the Policy by reason of Merck's failure to comply with its obligations under the Sue and Labor Clause.

■■■ It appears that the Policy's Sue and Labor Clause is in substance indistinguishable from those adopted in countless other insurance contracts and interpreted in other jurisdictions. As described by the Fifth Circuit in *Reliance Insurance Co. v. Escapade*, 280 F.2d 482, 488 n. 11 (5th Cir.1960), "the purpose of the clause is at least twofold. It is to (a) encourage and (b) bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss." *Id.* (internal citations and quotation marks omitted). An insured is obligated by the clause "to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy." *Id.* at 488.[13] That duty "is one of reasonable care under all the circumstances and in the light of pertinent commercial and maritime practices. It does not require the insured to use all possible care or to follow the wisest course." *Ope Shipping*, 687 F.2d at 643 (internal citations omitted).

The Court disagrees with Merck's contention that the imposition of this duty on the insured is indistinguishable from its implied duty to mitigate damages.[14] While

---

13. The Second Circuit, in *Ope Shipping, Ltd. v. Allstate Ins. Co., Inc.*, 687 F.2d 639, 643 (2d Cir.1982), stated that an insured was obligated by a sue and labor clause "to exercise the care of prudent *insured* owners to protect their property, in order to prevent or minimize loss to the carriers," (emphasis added) but the Fifth Circuit case that the Second Circuit cited in support of this proposition, *Fishing Fleet, Inc. v. Trident Insurance Co.*, 598 F.2d 925, 929 (5th Cir.1979), does not say this. Rather, that decision, citing *Reliance Insurance*, states that under a sue and labor clause, the "assured has the duty ... to exercise the care of a prudent *uninsured* owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy." *Id.* (emphasis added) (quoting *Continental Food Products, Inc. v. Insurance Company of North America*, 544 F.2d 834, 837 n. 1 (5th Cir.1977)). Moreover, the Fifth Circuit's explanation of the duties imposed on an insured by the sue and labor clause is in accord with treatises and other cases construing sue and labor clauses, *see, e.g., Young's Market Co. v. American Home Assur. Co.*, 4 Cal.3d 309, 93 Cal.Rptr. 449, 481 P.2d 817, 820 (1971); *Construction and Effect of "Sue and Labor" Clause*, 86 A.L.R.2d at 1247,. The Court has found no other case or treatise that imposes a duty of "prudent *insured* owners" on those covered by a sue and labor clause. Consequently, the Court concludes that the Second Circuit probably intended to state that a sue and labor clause required an insured to "to exercise the care of prudent *uninsured* owners to protect their property," but, given the citation to the Fifth Circuit doctrine, perhaps expressed the standard as it did due to a typographical error.

14. *Reliance Insurance*, which Merck cites in support of this proposition (*see* Merck Reply Mem. at 14), does not support the conclusion that a sue and labor clause imposes no duties separate and apart from the insured's duty to mitigate losses upon the insurer's breach of the agreement. Rather, it states that a sue and labor clause imposes a duty on the insured to "labor diligently for the recovery of the property and to alleviate the burden of the insurer" even if the clause does not explicitly state that it shall be "necessary" for the insured to do so. *See Reliance Insurance*, 280 F.2d at 488 n. 11 ("Courts have held that the insertion of the word 'necessary' [in a sue and labor clause] does not essentially alter the

there are some conceptual similarities between the two forms of obligations, Merck's duty under Pennsylvania law to mitigate damages only could have arisen upon American Home's breach of its obligations under the Policy. *See Koppers,* 98 F.3d at 1448. Merck's duty to protect and preserve insured property under the Policy, however, was continuous and did not arise only upon some action taken (or not taken) by its insurer, American Home. Moreover, the Sue and Labor Clause represents a specific, material provision of the insurance policy that imposes its distinct obligations upon the insured, separate and apart from any other express or implied duty that may arise by operation of law. If Merck failed to comply with its obligations under that clause, it would be in breach of *its* obligations under the Policy.

 The Policy does not describe the consequences of Merck's failure to comply with its obligations under the Sue and Labor Clause. But a 1901 Pennsylvania Supreme Court decision dealing with a sue and labor clause concluded that a jury was properly instructed to deny an assured recovery under an insurance policy if the assured violated its duties under the clause and was not otherwise authorized by the policy to abandon insured property. *See Jones v. Western Assur. Co. of Toronto,* 198 Pa. 206, 47 A. 948, 949 (1901) (approving of jury instructions stating that "if the assured unreasonably refused to [assist with salvage of a boat covered by the policy] ... *then there can be no recovery at all*" unless abandonment was permitted under the terms of the policy) (emphasis added). That statement was arguably *dicta,* as the insured was ultimately found to have had the right to abandon the insured property and thus to have avoided violat-

ing its obligations under the sue and labor clause of its insurance policy, but no other Pennsylvania state court decision found by the Court or brought to its attention contradicts, or sheds further light on, this conclusion. Thus, on the basis of *Jones,* the Court must predict that Pennsylvania law would hold that an insured's unreasonable actions in violation of its obligations under a sue and labor clause would bar it from recovering under the insurance policy.

The Court finds additional support for this proposition from other sources. First, applying a related principle, Pennsylvania cases state that an insured's breach of a material condition of an insurance policy forfeits the insured's rights to recover under the policy. *See, e.g., Cameron v. Berger,* 336 Pa. 229, 7 A.2d 293, 295 (1938) (noting that a "clause unquestionably constituted a material condition of the policy, and from the record it clearly appears that it was breached by [the insured] in such manner as to forfeit her rights against the company"). Second, there are cases in this District indicating that an insured's violation of its obligations under a sue and labor clause defeats its right to recover under the policy. *See American Nat. Fire Ins. Co. v. Mirasco, Inc.,* 249 F.Supp.2d 303, 327 (S.D.N.Y.2003) ("[I]f [the insured's] losses occurred as a result of breach of the sue and labor clause, recovery is not available."), *supplemented and reconsideration denied,* No. 99 Civ. 12405(RWS), 2003 WL 22271226 (S.D.N.Y. Sept.30, 2003); *International Commodities Export Corp. v. American Home Assur. Co.,* 701 F.Supp. 448, 452 (S.D.N.Y. 1988) ("When a policy contains a sue and labor clause, an insurer may be able to argue that the insured has forfeited its

operation of the clause. It imposes no additional duty on the master. He was already bound to labor diligently for the recovery of the property and to alleviate the burden of the

insurer.") (quoting *American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co.,* 282 F. 514, 522 (3d Cir.1922)).

coverage if it does not sue and labor to minimize the covered loss."); *Intermondale Trading Co. v. North River Ins. Co. of N.Y.*, 100 F.Supp. 128, 132 (S.D.N.Y. 1951).

## C. *SUMMARY JUDGMENT IS INAPPROPRIATE*

Having construed the relevant provisions of the Policy and reviewed the parties' factual submissions, the Court concludes that summary judgment is inappropriate with respect to the Prototype Claims. The Court examines each of the Prototype Claims in turn, but begins with an initial observation. Both American Home and Merck ask the Court to develop a definitive interpretation of Section 211.208 for purposes of deciding the parties' cross-motions for summary judgment, American Home contending that it is "for the Court to interpret the scope of the regulation" (Am. Home. Mem. at 21 (quoting *In re Extradition of Pineda Lara*, No. 97 Cr. Misc. 1, 1998 WL 67656, at *5 (S.D.N.Y. Feb.18, 1998))), and Merck asserting that "interpretation of words in a statute or regulation is one of law which must be made by a court" (citing *Arnold v. County of Nassau*, 252 F.3d 599, 602 (2d Cir.2001)).

The Court rejects this invitation, concluding that the clear terms of the Policy itself control, rather than any hypothetical duty that the Court might face were it required to interpret pertinent government regulations in the first instance. Under the terms of the Policy, coverage will be triggered where *Merck's own* reasonable interpretation of relevant FDA regulations leads to a determination that covered property is unfit for use. *See supra.* While certain aspects of the FDA regulatory scheme are unambiguous or have been definitively interpreted by the FDA, *see Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)

(holding that an agency's interpretations of its own regulations are "controlling unless clearly erroneous or inconsistent with the regulation"); *Dr. Reddy's Laboratories, Inc. v. Thompson*, 302 F.Supp.2d 340, 349 (D.N.J.2003) (applying this principle to FDA interpretations of its regulations), other aspects of the FDA regulatory scheme governing the Prototype Claims remain ambiguous, including, among other questions, whether Section 211.208 ought to apply to the pharmaceuticals and circumstances involved in each of the Prototype Claims, and how various terms within the regulation ought to be defined. These ambiguities form a primary source of the conflicts between the parties.

Merck would prove that its claim falls within the CDG Clause's affirmative grant of coverage if it establishes that it resolved these remaining ambiguities in a reasonable manner at the time it determined that it was required to declare the pharmaceuticals at issue in the Prototype Claims unfit for use. Numerous court decisions have refused to allow federal agencies to punish private parties who have taken action based on a reasonable interpretation of an ambiguity in a complex regulatory scheme, even when the federal agency ultimately adopts a contrary interpretation of the ambiguity that is itself reasonable. *See, e.g., Satellite Broadcasting Co., Inc. v. F.C.C.*, 824 F.2d 1, 3–4 (D.C.Cir.1987) ("The [agency] through its regulatory power cannot, in effect, punish a member of the regulated class for reasonably interpreting [agency] rules. Otherwise the practice of administrative law would come to resemble 'Russian Roulette.'"). These decisions acknowledge that courts may be called on to ascertain whether a private party's interpretation of a regulatory scheme is reasonable. That determination is the task that the Court, and ultimately, the factfinder, is instructed to perform by the Policy in this case. Consequently, in

the context of the instant motions, the Court will not determine that an interpretation of the FDA regulatory scheme adopted by Merck in relation to the Prototype Claims is unreasonable as a matter of law unless it it is clear that the interpretation is foreclosed by the plain language of the relevant regulations or by the FDA's own interpretation of its regulations.

### 1. *Prototype Claim 1*

■ The parties' submissions have revealed numerous genuine issues of material fact precluding summary judgment with respect to Prototype Claim 1. The parties dispute virtually all material aspects of this claim, and each has offered at least some evidence in support of its arguments. Genuine issues have been raised concerning whether Merck's application of Section 211.208 or, in the alternative, Section 211.204 to Prototype Claim 1 was reasonable; whether—and if so, for how long— temperatures inside the truck that was carrying the Vaccines dipped below the freezing point; whether any of the Vaccines, which were housed in insulated packaging, could have frozen even if the temperature readings proffered by Merck are to be believed; and whether, even if Merck would otherwise be entitled to coverage under the Policy, Merck failed to

discharge its duties under the Sue and Labor Clause by testing the Vaccines to determine whether they might be salvaged. While Merck appears to have made a substantial case for coverage based on the current record, it has left itself exposed to American Home's affirmative defenses by its failure to examine the Vaccines to determine whether they might have been salvaged (if salvage was permissible under applicable FDA Regulations),[15] the Court will not address the parties' voluminous evidentiary submissions and arguments related to this claim at the present time. Instead, the Court determines that under the circumstances "there is reason to believe that the better course would be to proceed to a full trial" on the claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Johns v. International Business Machines Corp.,* 361 F.Supp.2d 184, 191 (S.D.N.Y.2005).

### 2. *The Fiberboard Drum Claims*

■ In their moving papers related to Prototype Claims 2, 4, 5, and 6, the parties have raised arguments concerning whether Merck reasonably interpreted the requirements of Section 211.208 to apply to APIs, which are not explicitly governed by that

---

**15.** Without addressing the merits of the parties' expert reports and assertions concerning the parties' failure to ascertain whether the Vaccines could have been salvaged, the Court notes that Merck was able to determine that the Vaccines were fit for use before they left its Pennsylvania facility in a refrigerated truck. It is thus difficult for the Court to credit Merck's contention that "no acceptable testing exists" to determine whether the Vaccines remained fit for use when they arrived at Merck's Nevada facility three days later. (Merck Mem. at 27.) Given the substantial evidence in the record indicating that the Vaccines may not have frozen in transit, Merck cannot argue that even if could have established that the Vaccines met "all applicable standards of identity, strength, quality,

and purity," 21 C.F.R. § 211.208, it was completely unable to identify "evidence from inspection of the premises [indicating] that the drug products and their associated packaging were not subjected to improper storage conditions." *Id.*

Moreover, while American Home bears the burden of proving that Merck violated the Sue and Labor clause or its duty to mitigate with respect to this Prototype Claim, Merck cannot avoid a finding that it violated its obligations under the Policy by noting that American Home failed to perform any tests to determine the Vaccines' fitness for use. Merck, not American Home, bore the burden of preserving and minimizing losses to property covered by the Policy.

regulation, but which the FDA appears to have applied to APIs in regulatory guidance to manufacturers and enforcement actions on several occasions. (*See* Merck Opp. Mem. at 11 (citing regulatory guidance and enforcement actions applying Good Manufacturing Practices in 21 C.F.R. Parts 210 and 211 to APIs).)

Even assuming that Merck reasonably determined that Section 211.208 or related regulations applied to APIs, the Court concludes that Merck has failed to establish as a matter of law that it reasonably believed it was required to declare unfit for use the APIs in Prototype Claims 2 and 6 that remained sealed in two-layer polyethylene bags merely because the fiberboard drums in which the bags were packaged sustained some damage. Nor can the Court say, however, that a reading of Section 211.208 that interpreted the term "associated packaging" to include the fiberboard drums in which the APIs were contained was unreasonable as a matter of law. Merck's arguments for coverage related to fiberboard drums in Prototype Claims 2, 4, and 5 that sustained damage to the polyethylene bags protecting the APIs are, of course, much stronger.

But the Court cannot reject as a matter of law American Home's arguments that the insufficiency of Merck's packaging constituted an "inherent vice" precluding a finding that the circumstances leading to these claims constituted a "fortuitous event" necessary to trigger coverage under the CDG Clause. The Court is also unable to reject out of hand the possibility that Merck violated its duties under the Sue and Labor Clause or its obligation to mitigate when it failed to conduct any salvaging activities related to any of the APIs that are the subjects of the Prototype Claims. Consequently, the Court must deny the parties' motions for summary judgment related to Prototype Claims 2, 4, 5, and 6.

### 3. *Prototype Claim 3*

■ Genuine issues of material fact also preclude summary judgment on Prototype Claim 3. The Court begins its analysis of this claim by noting that nothing in the DOT's regulations would require Merck to discard the drugs that are the subject of this claim merely because they were shipped in a manner that may have violated those regulations. Thus, it would not be reasonable for Merck to claim coverage under the CDG Clause based only on the DOT regulations cited above.

■ Nonetheless, Merck may reasonably claim coverage under Section 211.208, which describes exposure to "fumes" as an improper storage condition. The parties dispute, however, whether the drugs were, or even could have been, exposed to chlorine gas fumes from the improperly packed, but allegedly empty, chlorine gas canisters. Even if Merck establishes that, under a reasonable interpretation of Section 211.208, the storage conditions of the drugs involved in Prototype Claim 3 were at least called into question, the Court cannot determine that American Home's asserted affirmative defenses cannot succeed as a matter of law. American Home has indicated that Merck, which did not conduct any testing in an effort to salvage Prototype Claim 3, could have easily ascertained whether the drugs and their associated packaging were exposed to chlorine gas fumes, and could have returned those drugs to the marketplace if there was no evidence that the drugs or their associated packaging were exposed to chlorine. A trial is necessary to resolve the validity of these arguments.

### D. *CONCLUSION*

To summarize, summary judgment is inappropriate with respect to each of the Prototype Claims. In order to establish whether and to what extent Merck is enti-

tled to coverage for the Prototype Claims, the factfinder will need to answer the following questions with respect to each of the Prototype Claims at trial:

1. Was the Prototype Claim triggered by a "fortuitous event"? If not, Merck is not entitled to coverage for the claim.

2. Has Merck sufficiently demonstrated that it reasonably interpreted the requirements of Section 211.208 (or potentially, Section 211.204) to apply to the Prototype Claim? If not, Merck is not entitled to coverage for the claim.

3. Has Merck sufficiently demonstrated that it reasonably believed that the pharmaceuticals that are the subject of the Prototype Claim were subjected to "improper storage conditions," as that term is used in Section 211.208? If the answer to this question is "yes," then Section 211.208 would require Merck to deem the pharmaceuticals "unfit for use," and the claim would fall within the CDG Clause's affirmative grant of coverage.

4. Even if the answer to the preceding question is "no," did Merck reasonably believe that there was "a question whether" the subjects of the Prototype Claim "were subjected to such [improper storage] conditions," as this phrase is used in Section 211.208? If so, the claim would fall within the CDG Clause's affirmative grant of coverage, since there is no evidence with respect to *any* of the Prototype Claims that Merck ever gathered "evidence from laboratory tests and assays . . . that the drug products meet all applicable standards of identity, strength, quality, and purity," 21 C.F.R. § 211.208, necessary for Merck to be allowed to salvage the drugs under the regulation.

5. If Merck is not otherwise entitled to coverage based on its "reasonable interpretation" of Section 211.208, would Merck nonetheless be entitled to coverage for any portion of the Prototype Claim that would have had to undergo "destructive testing"

in order to ascertain its fitness for use, or the fitness for use of the remainder of the pharmaceuticals that are the subjects of the Prototype Claims?

6. Even if Merck has demonstrated that the Prototype Claim would otherwise be fully or partially covered under the Policy, has American Home proven that Merck failed to satisfy its obligations under the terms of the Sue and Labor Clause of the Policy or its duty to mitigate damages? If so, Merck's coverage would be excluded or limited based on one of these affirmative defenses.

## III. *ORDER*

For the reasons discussed above, it is hereby:

**ORDERED** that the motion for summary judgment of plaintiff American Home Assurance Company ("American Home") is granted in part and denied in part to the extent specified in the decision above; and it is further

**ORDERED** that the motion for summary judgment of defendant Merck & Co., Inc. ("Merck") is hereby granted in part and denied in part to the extent specified in the decision above; and it is finally

**ORDERED** that the parties are directed to appear before the Court on September 23, 2005 at 9:15 a.m. to address remaining pretrial proceedings in this action, and to set a schedule for trial.

**SO ORDERED.**