AMERICAN HOME ASSURANCE COMPANY, Plaintiff,

v.

MERCK & CO., INC., Defendant,

v.

A.I. MARINE ADJUSTERS, Counterclaim Defendant.

No. 03 Civ. 3850(VM)(JCF).

United States District Court, S.D. New York.

Oct. 27, 2006.

Joseph F. Fields, Jerold Oshinsky, Dickstein, Shapiro, Morin & Oshinsky, L.L.P., New York, NY; Barry J. Fleishman, Dickstein Shapiro Morin & Oshinsky LLP, Washington, DC, for Merck & Co. Inc., Counter Claimant.

Nooshin Namazi, Nicoletti, Horning, Campise, Sweeney & Paige, New York, NY, for American Home Assurance Company Plaintiff.

John Anthony Vincent Nicoletti, Nicoletti Hornig Campise & Sweeney, New York,

NY, for American Home Assurance Company, Counter Defendant.

Anthony J. Pruzinsky, Hill, Rivkins and Hayden, NY, NY, for A.I. Marine Adjusters, Inc., ThirdParty Defendant.

Paul C. Sullivan, Paul O. Sullivan, Dickstein Shapiro Morin & Oshinsky LLP, New York, NY, for Merck & Co. Inc., Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff American Home Assurance Company ("American Home") filed this action [1] against its insured, pharmaceutical manufacturer Merck & Co., Inc. ("Merck"), seeking a declaratory judgment that American Home was not required to indemnify certain losses to shipments of products that Merck claims under a transit insurance policy bound and issued by American Home effective July 1, 2000 (the "Transit Policy"). To facilitate settlement and more efficient litigation, the parties' agreed to select for review on motions for summary judgment several of the disputed claims as prototypes (hereinafter, the "Prototype Claims"). Most recently, the Court considered the parties cross-motions for summary judgment regarding the proper interpretation of various clauses in the Policy with respect to Prototype Claims 1 to 6.[2] See American Home V, 386 F.Supp.2d at 501.

While American Home V considered whether the contract entitled either party to judgment as a matter of law with respect to Prototype Claims 1 to 6, Merck also asserts additional extra-contractual counterclaims [3] against both American Home and counterclaim defendant A.I. Marine Adjusters ("A.I.Marine"), the entity responsible for claim adjustment services under the Transit Policy. Specifically, Merck charges American Home and A.I. Marine with bad faith (Merck's Fourteenth Counterclaim), as well as negligence (Merck's Twelfth Counterclaim) and breach of fiduciary duty (Merck's Thirteenth Counterclaim) (collectively, the "Extra–Contractual Claims"). American Home and A.I. Marine have now separately moved for summary judgment dismissing the Extra–Contractual Claims.[4] For

---

**1.** The relevant facts of this case, summarized here insofar as necessary for the adjudication of remaining issues raised by the parties' motions now before the Court, are described in the Court's numerous opinions previously rendered in this case. See American Home Assurance Co. v. Merck & Co., 329 F.Supp.2d 436 (S.D.N.Y.2004) ("American Home I"); American Home Assurance Co. v. Merck & Co., 2004 WL 2149103 (S.D.N.Y. Sept.24, 2004) ("American Home II"); American Home Assurance Co. v. Merck & Co., 354 F.Supp.2d 318 (S.D.N.Y.2005) ("American Home III"); American Home Assurance Co. v. Merck & Co., 376 F.Supp.2d 469 (S.D.N.Y.2005) ("American Home IV"); American Home Assurance Co. v. Merck & Co., 386 F.Supp.2d 501 (S.D.N.Y.2005) ("American Home V"); see also American Home Assurance Co. v. Merck & Co., No. 03 Civ. 3850, 2005 WL 1153723 (S.D.N.Y. April 13, 2005) (Report and Recommendation of Magistrate Judge James Francis, dated Apr. 13, 2005 ("American Home

Report")); American Home Assurance Co. v. Merck & Co., No. 03 Civ. 3850, 2004 WL 2222148 (S.D.N.Y. Oct. 4, 2004).

**2.** At this point, Prototype Claims 1 to 6 are the only claims still in dispute between the parties.

**3.** See Amended Answer, Defenses, and Counterclaims of Defendant Merck & Co. Inc. To the Second Amended Complaint, dated September 17, 2003 ("Merck's Amended Answer and Counterclaims").

**4.** American Home also moves for an order to confirm the proper operation of the Transit Policy's Self–Insured Retention ("SIR") and an order declaring the maximum amount recoverable for each Prototype Claim after applying the SIR. The dispute regarding the SIR appears to be resolved, however, as Merck, in its opposition papers, concedes to "American

the reasons set forth below, American Home's motion is granted, and A.I. Marine's motion is granted in part, and denied in part.

## I. BACKGROUND [5]

### A. MERCK'S BAD FAITH ALLEGATIONS AGAINST AMERICAN HOME

Merck alleges that with respect to the Prototype Claims [6] at issue, American Home acted in bad faith by (1) ignoring the merits of the Prototype Claims and denying them based on an unreasonable reading of the "Control of Damaged Goods clause" (the "CDG Clause") that was inconsistent with American Home's prior claims practices under the Transit Policy; (2) requiring Merck to provide American Home with manufacturing costs information on Active Pharmaceutical Ingredients ("APIs") involved in the inter-company shipments between Merck subsidiaries, contrary to established procedures; and (3) denying claims without first conducting a reasonable investigation.

### 1. Denial Based on the CDG Clause

The CDG Clause governs the circumstances in which Merck could recover for products lost in transit. *See American Home V,* 386 F.Supp.2d at 505–07. Merck alleges that the parties both understood the clause. to allow Merck to determine when specific products potentially compromised in transit were in fact unfit for use under applicable government regulations. Further, Merck claims that under the Transit Policy, American Home had paid numerous claims, on facts similar to the Prototype Claims, based solely on Merck's own determination that the product was unfit for use as a result of damage suffered in transit. However, Merck asserts that in early 2002 American Home unreasonably changed its position on the CDG clause in order to avoid paying several losses that involved high value pharmaceuticals.

In March of 2002, in response to notice of two high-value claims (Prototype Claims 2 and 3), American Home instructed its claims adjusters handling them to do some

Home's interpretation of the SIR," wherein "the maximum SIR for an occurrence is $500,000." (*See* Merck & Co., Inc.'s Memorandum of Law in Opposition to Plaintiff American Home Assurance Company's Motion For Summary Judgment to Dismiss Extra–Contractual Claims and To Confirm Operation of the SIR, dated April 24, 2006 ("Merck's Opp. to American Home"), at p. 24.) As the parties' papers proffer different maximum values for each of the Prototype Claims, the Court declines to declare a maximum recovery at this time.

**5.** The factual summary below derives from the following documents: Plaintiff American Home Assurance Company's Local Civil Rule 56.1 Statement in Support of Motion for Summary Judgment to Dismiss Extra–Contractual Claims and To Confirm Operation of the SIR, dated Mar. 15, 2006 ("American Home Rule 56.1 Statement"); Merck & Co., Inc's Response to Plaintiff American Home

Assurance Company's Local Civil Rule 56.1 Statement in Support of Motion for Summary Judgment to Dismiss Extra–Contractual Claims and To Confirm Operation of the SIR, dated April 24, 2006 ("Merck Rule 56.1 Opp. Statement"); Plaintiff American Home Assurance Company's Local Civil Rule 56.1 Counter–Statement in Opposition to Merck & Co., Inc.'s Local Rule 56.1(b) Statement, dated May 15, 2006 ("American Home Rule 56.1 Counter–Statement"); Supplemental Declaration of Anthony J. Pruzinsky in support of A.I. Marine's Motion for Summary Judgment, dated May 16, 2006; and from the affidavits, deposition transcripts, and additional documents cited therein. Except where specifically referenced, no further citation to these sources will be made.

**6.** Familiarity with the facts specific to each of the Prototype Claims is presumed based on the Court's prior decisions. *See American Home V,* 386 F.Supp.2d 501 at 507–13.

"damage control" and get "fussy" about covering the claims. (*See* Merck Rule 56.1 Opp. Statement ¶¶ 549–50.) In July of 2002, American Home issued a revised "Instructional Handling Advice" after what the Advice describes as "a rash of heavy claims," (*See* American Home 56.1 Statement, Ex. 39), which does in fact take a much firmer stance on the CDG clause than the initial "Worldwide Claim Handling Instructions" issued in July of 2000. (*See* American Home 56.1 Statement, Ex. 36.) According to Merck, American Home effectively rewrote the CDG clause and began to require, in order to claim a total loss, that Merck either get a ruling from the FDA that the product was in fact unfit for use, or do the necessary testing to determine that the entirety of the product was physically damaged.

### 2. *Requiring Manufacturing Cost Information*

According to Merck, American Home unreasonably required the manufacturing costs of APIs involved in the inter-company shipments between Merck subsidiaries in Prototype Claims 2, 4 and 5, even though the parties understood, based on Merck's prior coverage with a different insurer, and the premiums negotiated under the Transit Policy, that these APIs would be valued at sales price. Merck argues that American Home paid other high-value claims involving similar facts at sales price, and did not even request manufacturing cost information for Prototype Claims 2, 4 and 5 until long after those claims had been denied.

### 3. *Failure to Conduct a Reasonable Investigation*

Merck also asserts that American Home denied the Prototype Claims without first investigating whether the drugs were in fact fit for use under applicable govern-ment regulations and then used the discovery process to attempt to discredit Merck's initial determinations that the products were unfit. Merck claims that the surveyors American Home hired to review the Claims had no knowledge of FDA regulations and were specifically instructed to limit their investigation to whether physical damage had occurred.

### B. *AMERICAN HOME'S GROUNDS FOR DENYING CLAIMS*

American Home asserts that coverage was denied on the Prototype Claims for several legitimate reasons. Regarding the CDG clause in particular, American Home responds that it believed Merck did not use "reasonable discretion" in determining that the goods at issue were unfit for use under applicable government regulations. American Home claims that Merck refused to point out the specific government regulations that allegedly informed Merck's determinations or in any way explain its interpretation of those regulations.

American Home further asserts that the Transit Policy placed certain obligations on Merck to undertake sufficient loss control and that Merck repeatedly disregarded American Home's instructions in this regard. Specifically, American Home claims that extensive discussions were undertaken during the negotiation of the Transit Policy regarding Merck's loss control efforts and Merck made specific representations that it would cooperate in implementing reasonable standards of care and upgrade its packaging to reduce the losses sustained in transit.

With respect to Prototype Claims 2, 4, 5 and 6 (the "Fiberboard Drum Claims"), *see American Home V*, 386 F.Supp.2d at 509–11, American Home argues that Merck was repeatedly advised to switch to more durable shipping containers for high value APIs to avoid unnecessary transit losses.

(*See* American Home Rule 56.1 Statement ¶ 122.) Thus, American Home asserts that its denial of Prototype Claims 2, 4, 5 and 6 was based in part on Merck's failure to cooperate on loss control.[7]

Finally, American Home contends that Merck had obligations under the Transit Policy's Sue and Labor Clause, *See* American Home IV, 386 F.Supp.2d at 520, to determine whether any or all of the pharmaceuticals at issue could be salvaged before claiming a total loss, and that Merck made no efforts to salvage any of the pharmaceuticals involved in the Prototype Claims.

## C. *MERCK'S ADDITIONAL EXTRA–CONTRACTUAL CLAIMS*

Merck alleges that A.I. Marine, the entity responsible for providing claim service under the SIR, "conspired with" American Home and engaged in bad faith by miscalculating the SIR, failing to maintain adequate records relating to Merck's claims, delaying the processing of claims, and misinforming Merck as to the status of claims. (*See* Merck's Amended Answer and Counterclaims, ¶ 138). Merck asserts A.I. Marine, at the "behest" of American Home, improperly eroded the SIR only with regard to amounts for which Merck had established physical loss or governmental intervention, and that A.I. Marine tracked only American Home's version of losses.

Merck relies on the same allegations in alleging breach of fiduciary duty and negligence against A.I. Marine, and also asserts these counterclaims against American Home, stating that the duties owed Merck were breached by A.I. Marine at the "behest" of American Home.

Merck asserts that the Transit Policy created a separate contractual relationship between Merck and A.I. Marine, and that this contract established certain duties owed Merck by A.I. Marine, duties which form the basis of its claims. The Transit Policy was negotiated by American International Marine Agency, Inc. ("AIMA"), and the parties do not dispute that AIMA was acting as American Home's agent, with the authority to issue contracts on behalf of American Home, and that it did in fact negotiate and issue the Transit Policy on behalf of American Home. What is disputed, however, is the nature of A.I. Marine's relationship to AIMA, American Home and Merck with respect to the Transit Policy.

A.I. Marine asserts that it is a third-party claims adjuster retained by AIMA pursuant to an oral contract and was "paid by AIMA on a fee-scale basis and was responsible for the administration of claims that AIMA on behalf of American Home was obligated to handle under the Transit Policy." (Counterclaim Defendant A.I. Marine Adjusters, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment, p. 7 ("A.I. Marine's Brief")). According to A.I. Marine, it was a disclosed agent of American Home. *See, id.* at 18.

Merck claims that AIMA was acting as A.I. Marine's agent and that the Transit Policy created a contractual relationship between Merck and A.I. Marine for claims service. Merck emphasizes that Endorsement 4 of the Transit Policy states that Merck "will employ [A.I. Marine]."[8] Al-

---

**7.** Merck contends, however, that fiberboard drums were the industry standard and that it had explicitly advised American Home that it would not switch away from them. (*See* Merck Rule 56.1 Opp. Statement ¶¶ 502–03.)

**8.** The Endorsement actually says "A.I.A.C.," and although this ambiguity was originally a point of some confusion, *see American Home II*, 2004 WL 2149103 at *3, the parties now appear to be in agreement that this endorsement was a reference to A.I. Marine. (*See*

though Merck paid its claim services fees directly to AIMA, Merck alleges it understood AIMA to be merely processing these fees for A.I. Marine.

## D. *THE COURT'S PRIOR DECISIONS*

Three of the Court's prior decisions are particularly relevant to the determination of the instant motions.

First, in *American Home III*, the Court upheld Magistrate Judge James C. Francis's conclusion that Merck stated a viable claim for breach of fiduciary duty against A.I. Marine and noted that American Home (arguing on behalf of A.I. Marine) "has not demonstrated that, under Pennsylvania Law, independent claim adjusters owe no fiduciary duties towards insureds where the claims at issue were subject to a self-insured retention, as was the case here." 354 F.Supp.2d at 321. Based on Merck's assertion of a contractual relationship, the Court held Merck had sufficiently pled a fiduciary duty claim against A.I. Marine. *Id.*

In *American Home IV,* the Court upheld the Report and Recommendation ("Report") issued by Magistrate Judge Francis on April 13, 2005, which found that neither party was entitled to partial summary judgment on Prototype Claims 2, 4 and 5 with respect to the interpretation of the valuation clause in the Transit Policy. *See* 376 F.Supp.2d at 469 ("The Report correctly concluded that the valuation clause is ambiguous, as each party's construction of the clause, while plausible, is not the only reasonable reading of the policy"). Merck argues that the Prototype Claims at issue should be governed by the first part of the Valuation Clause, which entitles Merck to the invoice price plus 10 percent (i.e., sales price), whereas American Home contends that the Prototype Claims should be governed by the third part of the clause, which covers unfinished goods and entitled Merck to the manufacturing costs of the claimed shipments. *See American Home Report*, 2005 WL 1153723 at *2. As Magistrate Judge Francis concluded, "[t]here is extrinsic evidence that supports both competing positions, and each party has engaged in a course of conduct that, at least in part, supports its adversary's position." *Id.* at *1.

In *American Home V*, this Court considered the interpretation of the CDG Clause as well as the Sue and Labor Clause. In denying in part summary judgment for both parties, the Court found the CDG clause did in fact entitle Merck to determine, based upon its own reasonable interpretation, whether the pharmaceuticals at issue were unfit for use. *See* 386 F.Supp.2d at 514. While the Court noted that Merck had made a substantial showing that it had in fact reasonably interpreted the applicable government regulations, particularly with respect to Prototype Claim 1, and those fiberboard drums in Prototype Claims 2, 4, and 5 that sustained damage to the polyethylene bags protecting the APIs, *see id.* at 520–521, the Court held that with respect to all the Prototype Claims, American Home had reasonable affirmative defenses which could not be denied as a matter of law.

With respect to the Fiberboard Drum Claims, the Court could not "reject as a matter of law American Home's arguments that the insufficiency of Merck's packaging constituted an inherent vice...." *Id.* at 521. Nor could it reject "the possibility that Merck violated its duties under the Sue and Labor Clause or its obligation to mitigate when it failed to conduct any salvaging activities...." *Id.* Similarly, the

Reply Brief in Response to Merck & Co., Inc.'s Submission in Opposition to A.I. Marine Adjuster, Inc.'s Motion for Summary Judgment, p. 7 ("A. I. Marine's Reply")).

Court found the Sue and Labor Clause might provide an affirmative defense to American Home for Prototype Claims 1 and 6.

## II. *LEGAL STANDARD*

The Court may not grant summary judgment "unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Island Software and Computer Service, Inc. v. Microsoft Corp.,* 413 F.3d 257, 260 (2d Cir.2005) (citing Fed.R.Civ.P. 56(c)). In determining whether any genuine issues of material fact exist that would preclude summary judgment, the Court must "draw all permissible inferences in favor of the non-moving party." *Kapps v. Wing,* 404 F.3d 105, 112 (2d Cir.2005). The Court does not, however, defer to a party's legal arguments on summary judgment; "with respect to a motion for summary judgment, questions of law are for the court." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 534 (2d Cir.1993).

## III. *DISCUSSION*

### A. *MERCK'S BAD FAITH CLAIM AGAINST AMERICAN HOME*

Under Pennsylvania insurance law applicable to this action, an insured can bring a claim against its insurer for bad faith. *See* 42 Pa.C.S. § 8371 ("Section 8371"). The insured must demonstrate, by clear and convincing evidence, "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (3d Cir.1997) (*citing Terletsky v. Prudential Property & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied,* 540 Pa. 641, 659 A.2d 560 (1995)).

As regards the bad faith standard, Pennsylvania law also provides that, "a reasonable basis is all that is required to defeat a claim of bad faith." *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir.2004) (despite taking inconsistent positions on the policy and publishing marketing materials which "may have created the appearance of bad faith," there was insufficient evidence for jury to conclude J.C. Penny acted unreasonably). This first part of the *Klinger* test—whether or not a "reasonable basis" to deny coverage existed—is an objective determination. *See Williams v. Hartford Casualty Ins. Co.,* 83 F.Supp.2d 567, 574 (E.D.Pa. 2000), *aff'd,* 261 F.3d 495 (3d Cir.2001). Thus, "if there is a reasonable basis for delaying resolution of a claim, even if it is clear that the insurer did not rely on that reason, there cannot, as a matter of law be bad faith." *Id.; see also Bell v. Allstate Ins. Co.,* No. 03–CV–4482, 2005 WL 1353527, *5 (E.D.Pa. May 31, 2005).

Here, viewing the evidence in the light most favorable to Merck, even if the Court were to find that Merck has established by clear and convincing evidence that American Home unreasonably relied on the CDG clause in refusing to credit Merck's reasonable interpretation of government regulations when Merck declared the pharmaceuticals at issue unfit for use, American Home can still point to a reasonable basis for denying each of the Prototype Claims. With respect to the Fiberboard Drum Claims, this Court has already held that (a) Merck's alleged failure to take adequate loss control measures may take the claims out of the category of "fortuitous event" and preclude Merck from claiming coverage, (b) the Sue and Labor Clause may substantially limit Merck's coverage due to its failure to conduct any salvaging activities on the APIs at issue, and (c) American Home's

interpretation of the Valuation clause as limiting Merck to the manufacturing costs of the APIs was not unreasonable. *See American Home V,* 386 F.Supp.2d at 521; *American Home IV,* 376 F.Supp.2d at 470. With respect to Prototype Claims 1 and 3, the Court again found that the Sue and Labor Clause precluded it from finding Merck's interpretation of the contract unreasonable. *See American Home V,* 386 F.Supp.2d at 520–21.

American Home contends that Merck was required to do more under the CDG clause then simply declare goods unfit and that Merck was required to take greater efforts with respect to loss control. Whether American Home was correct in its interpretation of the Transit Policy, and whether Merck ultimately prevails on its breach of contract claim, is a separate question. *See Burrell v. United Health Care Ins. Co.,* No. Civ. A. 00–4697, 2001 WL 873221, *2 n. 4 (E.D.Pa. July 30, 2001)("The court's holding that defendant had a reasonable basis for denying plaintiff's claim does not dictate that defendant's interpretation was correct, or that plaintiff will not be given an opportunity to prove at trial that he was entitled to coverage...."). The relevant question with respect to Merck's bad faith claim is whether an objectively reasonable basis for American Home to deny coverage existed. In this regard, this Court finds the circumstances at issue here similar to those the court addressed in *Toll Naval Associated v. Lexington Ins. Co.,* No. Civ. A. 03–6537, 2005 WL 1923836, *4 (E.D.Pa. Aug. 10, 2005), which stated:

> Defendants argue in their motion that plaintiff fails to meet its burden of proof with respect to the first element of a bad

faith claim. This argument is a compelling one, in light of what this court has already held: that defendants and plaintiff both proffered reasonable interpretations of ambiguous terms in the policies.

As this Court has already determined on prior summary judgment motions, based on the disputed Transit Policy provisions and evidence submitted by the parties,[9] that there is some support for both parties positions, Merck cannot establish bad faith. *See Bostick v. ITT Hartford Group, Inc.,* 56 F.Supp.2d 580, 587 (E.D.Pa.1999) ("Bad faith cannot be found where the insurer's conduct is in accordance with a reasonable but incorrect interpretation of the insurance policy and the law.").

Even were the Court to conclude that American Home lacked any reasonable basis to deny the claim, the Court finds insufficient evidence with respect to the second element of a bad faith claim— knowing or reckless disregard for the lack of a reasonable basis for denial. Assuming American Home's several asserted bases for denial were all in fact unreasonable, Merck does not proffer evidence demonstrating that American Home knew or recklessly disregarded its lack of a reasonable basis. *See Williams,* 83 F.Supp.2d at 572 ("The primary consideration is the degree to which a defendant insurer knew it had no basis to deny the claimant."). In fact, the evidence presented indicates that American Home was relying on the reasons cited above in denying the prototype claims, and believed them to be legitimate reasons for denying coverage. In an March 25, 2002 internal AIMA e-mail, William Lang ("Lang"), AIMA Vice President

---

9. The Court recognizes that additional depositions were taken and additional exhibits were submitted in support of the motions currently before the Court. The Court has reviewed all the documents submitted by all the parties and finds no new evidence sufficiently compelling to alter the Court's prior determinations.

and Manager in Charge of the New York region, wrote:

> We need to arrange a meeting with the Broker as soon as possible. The current situation involving large "Control of Damage Goods" claims cannot continue. We spent the last 18 months giving the Assured regular feedback on loss control actions that would eliminate their numerous damage claims. They have taken no substantial steps to implementing these changes.

(*See* American Home's 56.1 Statement, ¶ 130.) In an April 3, 2002 internal AIMA e-mail, Lang again emphasizes Merck's having ignored its loss control endeavors and also notes, in reference to the CDG Clause, that Merck "never tested products even where damage seems superficial ... have not given FDA guidelines requiring destruction ... have not given us Internal Merck guidelines for destruction." (American Home's 56.1 Counter-statement, ¶ 552.) The Court is persuaded that internally American Home did appear to be relying on the reasons cited above in denying Merck's claims, and Merck has not presented substantial evidence, and certainly not clear and convincing evidence from which a reasonable jury could find that American Home was disingenuously relying on these grounds with sufficient knowledge or reckless disregard that these were in fact illegitimate grounds to deny coverage.

Merck makes much of its assertion that American Home previously covered similar claims and that American Home's sudden change of position to avoid paying several high value claims indicates its bad faith. Merck cites to another internal AIMA e-mail from Lang on April 8, 2002 stating that "[p]ast claims, like these but smaller, were paid a little too easily. So a bad precedent was created." (Merck's 56.1 Opp. Statement, ¶ 553). While American Home states that these previous claims were simply paid by mistake, even if that explanation were not the case, that American Home affirmatively decided to take a tougher approach with respect to the Prototype Claims does not, in and of itself, amount to knowingly or recklessly disregarding its lack of a reasonable basis to deny coverage. *Cf. Burrell*, 2001 WL 873221, at *3 ("The fact that defendant chose to raise a reasonable defense in response to plaintiff's claim in this case, rather than enter into a quick settlement as it did in settling the other claims, does not give rise to bad faith on the part of defendant."). Moreover, with respect to the Fiberboard Drum Claims in particular, Merck's perceived continued refusal to cooperate with American Home's loss control suggestions was clearly a key factor in American Home's alleged changed position.

Finally, the assertion that American Home failed to initially conduct a reasonable investigation and then used discovery in this action to discredit Merck's initial determination is not supported by the record. Moreover, "while the [insurer's] alleged bad faith need not be limited to the literal act of denying a claim, and may extend to the investigation of a claim, the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits." *Toll Naval Assoc.*, 2005 WL 1923836, at *5. As long as American Home had some reasonable basis for the initial denial, there is nothing improper about further investigation leading to a refined position with respect to coverage denial. *See id.* An insurer does not "act in bad faith by investigating and litigating legitimate issues of coverage." *J.C. Penney Life Ins. Co.*, 393 F.3d at 368 (internal citations omitted).

In sum, to succeed on a claim of bad faith, the plaintiff must "show that the

evidence is so clear, weighty, and convincing as to enable a clear conviction, without hesitation, about whether or not the defendant acted in bad faith ... the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." *Id.* at 367. Based on the Court's prior rulings, even drawing all reasonable inferences in favor of Merck, there is insufficient evidence on the record here from which a reasonable jury could find by clear and convincing evidence that American Home acted in bad faith.

### B. *MERCK'S ADDITIONAL EXTRA–CONTRACTUAL CLAIMS*

■ Merck cannot state a viable claim against American Home for negligence or breach of fiduciary duty because under Pennsylvania law "there is no tort-law cause of action against an insurer for negligence and breach of fiduciary duty: such claims must be brought in contract." *Ingersoll–Rand Equip. Corp. v. Transportation Ins. Co.*, 963 F.Supp. 452, 453–54 (M.D.Pa.1997). This prohibition derives from Pennsylvania's enactment of Section 8371, which "provides the sole remedy for punitive damages for insureds ... who allege bad faith or breach of fiduciary duty by an insurer." *Greater New York Mutual Ins. Co. v. North River Ins. Co.*, 872 F.Supp. 1403, 1409 (E.D.Pa.1995), *aff'd*, 85 F.3d 1088 (3d Cir.1996). To the extent Merck may establish that American Home acted improperly under the Transit Policy, those allegations are properly pled under Merck's breach of contract claim and its Section 8371 bad faith claim. Thus, Merck's negligence and fiduciary duty claims against American Home are redun-

dant of, and subsumed, by the former claims. *See Ross v. Metropolitan Life Ins. Co.*, 411 F.Supp.2d 571, 583–84 (W.D.Pa. 2006); *Belmont Holdings Corp. v. Unicare Life & Health Ins. Co.*, No. Civ. A. 98–2365, 1999 WL 124389, (E.D.Pa. Feb.5, 1999).

While Merck's counterclaims state that it was A.I. Marine that breached the alleged duties owed Merck, Merck asserts these breaches occurred at the "behest" of American Home and thus "American Home and/or A.I. Marine Adjusters are liable to Merck." (Merck's Amended Answer and Counterclaims, ¶¶ 130, 135.) The charge that American Home directed A.I. Marine to breach duties to Merck does not make the claims any more viable against American Home, even if Merck's pleading were read to specifically allege conspiracy or concerted action. *See Greater New York Mutual Ins. Co.*, 872 F.Supp. at 1408 ("There is no actionable tort for conspiring or taking concerted action to breach a duty of good faith.").

■■ Turning to Merck's Extra–Contractual Claims asserted against A.I. Marine, the condition precedent to Merck's claims is establishing that A.I. Marine was not simply an agent of American Home but that A.I. Marine contracted directly with Merck and that certain duties flowed from this contractual relationship. Generally, a claims adjuster's duties "are to their principals, the insurance companies, to perform whatever tasks were assigned to them, but this duty [does] not serve to create a contractual obligation between the adjusters and [the insured]." *Hudock v. Donegal Mutual Ins. Company*, 438 Pa. 272, 264 A.2d 668, 672 (1970).[10] Thus, a

**10.** A.I. Marine's motion papers vigorously argue that New York law should govern the resolution of Merck's claims against it, even though A.I. Marine concedes that "there is no

material difference between the laws of New York and Pennsylvania with respect to the claims against A.I. Marine." (A.I. Marine's Brief, p. 9). This Court has already held that

claims adjuster such as A.I. Marine ordinarily owes no duty directly to an insured such as Merck. *See id.* However, an adjuster may have obligations to the insured if there is a contract directly between them. *See Ruthardt v. Sandmeyer,* No. Civ. A. 94–6105, 1995 WL 649142, *3 (E.D.Pa. Nov.3, 1995); *Bleday v. OUM Group,* 435 Pa.Super. 395, 645 A.2d 1358, 1363 (1994).

■ Merck asserts that the Transit Policy did create such contractual obligations between itself and A.I. Marine. The Transit Policy was explicitly negotiated with the specific understanding that Merck "will employ" A.I. Marine to handle claim services under the SIR. (Transit Policy, Endorsement 4). Merck paid for those services, separate and apart from its premium payments to American Home. Merck's broker clearly testified that it was his understanding Merck was engaging two services under the Transit Policy. (*See* Philip Adams Deposition, at 221–222, Ex. 1 to Merck's 56.1 Opp. Statement). While Merck's payments were made through AIMA, it is undisputed that payment was for A.I. Marine's services. Just as AIMA negotiated on behalf of its sister company American Home, it is not unreasonable for Merck to have perceived AIMA as providing the same function for A.I. Marine. Under such circumstances, drawing all reasonable inferences in favor of Merck, a genuine dispute as to a material fact exists regarding whether Merck contracted with A.I. Marine.

Pennsylvania law governs claims arising out of the Transit Policy, a determination that was briefed with A.I. Maine's full knowledge, and A.I. Marine made no objection to the application of Pennsylvania law when the Court previously ruled on Merck's counterclaims against it, despite the fact that A.I. Marine was "in court, represented by counsel, and is not now here complaining about the

With respect to Merck's Thirteenth Counterclaim asserting breach of fiduciary duty against A.I. Marine, assuming the existence of a contractual relationship, this Court has already indicated that in light of the unusual situation that A.I. Marine was adjusting claims that Merck was self-insuring, it cannot be said as a matter of law that under such circumstances a claims adjuster would owe no fiduciary duties to the insured. *See American Home III,* 354 F.Supp.2d at 321. While a claim adjuster's principal is usually the insurance company, *see Hudock,* 264 A.2d at 672, under a standard insurance policy it is usually the insurance company that makes payment on the claims being adjusted. Here, however, Merck is both insured and insurer. If a jury were to find that Merck had contracted directly for A.I. Marine's services, then Merck should also have the opportunity to prove that this contract, which required A.I. Marine to adjust claims that Merck was itself insuring, created certain fiduciary duties.

Thus, Merck must establish (1) the existence of its contractual relationship with A.I. Marine and (2) that certain fiduciary duties resulted from that relationship. The Court notes that it may be difficult for Merck to prove that it understood A.I. Marine to be its fiduciary where there is no written document or referenced conversations laying out the terms, conditions and duties of the alleged contract, and where Merck's own counterclaims refer to A.I. Marine as a "wholly owned instrumentality" of American Home. (Merck's

assertion of breach of fiduciary duty claims against it." *American Home III,* 354 F.Supp.2d at 321 n. 3. As Merck's claims against A.I. Marine arise out of the alleged contract created by the Transit Policy, the Court reaffirms its prior determination that Pennsylvania law governs the claims against A.I. Marine.

Amended Answer and Counterclaims, ¶¶ 129, 132.) Nevertheless, drawing all reasonable inferences in favor of Merck, considering the unique nature of the claim services A.I. Marine was providing to Merck, the Court cannot say as a matter of law that Merck fails to state a breach of fiduciary duty claim against A.I. Marine.

Merck offers evidence that A.I. Marine failed to track Merck's version of the loses claimed under the policy, and that A.I. Marine eroded the SIR in accordance with American Home's strict interpretation of the CDG clause. If a jury were to find that A.I. Marine did in fact owe a sufficient duty of loyalty to Merck in its claim service under the SIR, such conduct if proven, could lead a reasonable jury to find A.I. Marine breached a fiduciary duty to Merck.

■ While Merck's fiduciary duty claim is sufficiently viable against A.I. Marine to defeat a summary judgment motion, Merck's bad faith claim is not. A claim under Section 8371 can be brought only against an insurer, not an insurance adjuster such as A.I. Marine. *See Lindsey v. Chase Home Finance, LLC,* No. 3: CV–06–1220, 2006 WL 2524227, *3–4 (M.D.Pa. Aug.30, 2006); *Powell v. Crawford & Co.,* No. 03–2182, 2003 WL 22657187, *3 (E.D.Pa. Apr.4, 2003). Even if Merck could bring a bad faith claim against A.I. Marine, the gravamen of Merck's allegations against A.I. Marine is that it did what American Home told it to do; A.I. Marine adjusted claims based on American Home's allegedly improper interpretation of the CDG clause and tracked losses based on that incorrect interpretation, while at the same time failing to track the losses as asserted by Merck. As the Court has concluded that American Home was not acting in bad faith, A.I. Marine similarly could not have acted in bad faith in servicing claims in accordance with

American Home's guidance, unless A.I. Marine had a duty of loyalty to Merck, which could be breached even if American Home's directives to it in adjusting the SIR were reasonable. Either A.I. Marine was an agent of American Home, in which case A.I. Marine cannot have acted in bad faith unless American Home did, or Merck is correct that a direct contract with A.I. Marine existed, and A.I. Marine would only have acted in bad faith if it had a duty of loyalty to Merck. If the latter is found to be the case, then A.I. Marine's conduct would be properly challenged by Merck's breach of fiduciary duty claim.

■ Finally, with respect to Merck's Twelfth Counterclaim asserting negligence, the Court agrees with A.I. Marine and American Home that Pennsylvania's adherence to the economic loss doctrine bars this claim. *See Nufeeds, Inc. v. Westmin Corp.,* No. Civ. A. 04–1071, 2006 WL 1000021, *8 (M.D.Pa. Apr.17, 2006) ("Pennsylvania courts have consistently refused to recognize a cause of action in negligence or strict liability for economic injury unattended by physical injury or damage to real or personal property."); *Cutting Edge Sports, Inc. v. Bene–Marc, Inc.,* 2003 No. 01835, 2006 WL 1492452, * (Pa. Comm. Pl. May 2, 2006) ("[P]laintiff's claimed damages constitute the difference between the amounts they paid for the insurance they received and the lesser amounts they claim they should have paid. Since plaintiffs' damages are solely economic, their claims for negligence fail."). Here, Merck is unquestionably claiming purely economic damages, thus its negligence claim must be dismissed.

## IV. *ORDER*

For the reasons discussed above, it is hereby:

ORDERED that the motion for summary judgment of plaintiff American Home Assurance Company ("American Home") is granted and the Twelfth, Thirteenth and Fourteenth Counterclaims of defendant Merck & Co., Inc. ("Merck") are dismissed as against American Home; and it is further

ORDERED that the motion for summary judgment of counterclaim-defendant A.I. Marine Adjusters, Inc. ("A.I.Marine") is hereby granted with respect to Merck's Twelfth and Fourteenth Counterclaims and denied with respect to Merck's Thirteenth Counterclaim; and it is finally

ORDERED that the parties are directed to appear before the Court on November 3, 2006 at 11:00 a.m. to address remaining pretrial proceedings in this action, and to set a schedule for trial, which shall commence the week of April 23, 2007.

SO ORDERED.