## AMERICAN HOME ASSURANCE COMPANY, Plaintiff,

v.

## MERCK & CO. INC., Defendant.

### No. 03 Civ. 3850(VM).

United States District Court, S.D. New York.

Aug. 5, 2004.

---

Nooshin Namazi, John Nicotetti, Nicoletti Hornig & Sweeney, New York, NY, for plaintiff.

Jerold Oshinsky, Paul C. Sullivan, Paul O. Sullivan, Dickstein Shapiro Morin & Oshinsky, LLP, New York, NY, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff American Home Assurance Company ("American Home"), a commercial insurance provider, brings this action for declaratory judgment against Merck & Co. Inc. ("Merck"), a manufacturer and distributor of pharmaceutical products. The dispute revolves around American Home's refusal to indemnify selected Merck product losses under a transit insurance policy (the "Policy") that American Home issued to Merck in 2000. In the underlying action, American Home seeks a declaratory judgment that it is entitled to deny the subject claims in whole or in part, while Merck counterclaims for breach of contract, negligence, fraud [1] and breach of fiduciary duty, and other common law and statutory claims. The parties' respective motions endeavor to identify the appropriate jurisdictional grounds and controlling law governing their dispute. Merck urges dismissal or partial summary judgment on the issue of admiralty jurisdiction, and American Home requests partial summary judgment on the issue of choice of law. For the reasons discussed below, Merck's motion for partial summary judgment is granted and American Home's motion is denied. Accordingly, the Court will consider this case under diversity jurisdiction and apply Pennsylvania law.

## I. FACTS AND PROCEEDINGS

### A. THE UNDERLYING DISPUTE

Early in 2000, Merck's insurance broker, Aon Risk Services of Pennsylvania, Inc. ("Aon"), contacted American Home's New York office to discuss coverage for the risk of loss associated with product transportation. Following this initial contact, Aon and American International Marine Agency of New York, Inc. ("AIMA"),[2] American Home's agent, began to negotiate the terms of a universal transit policy. Aon and AIMA used a manuscript Aon policy form as their first draft, and met regularly in New York throughout 2000 to revise specific terms and premiums. The drafting discussions were held in New York to accommodate the physical locations of both American Home and AIMA. A local Aon representative, Robert DeMotta, attended the negotiations in person and reported their developments to Joan O'Brien, Merck's primary contact, who was based in Aon's Philadelphia office.

On or about December 15, 2000, American Home executed the Policy from its New York office. The Policy's coverage was retroactively effective for a three-year term beginning July 1, 2000 and continuing through July 1, 2003. Among other things, the Policy covered any losses involving the domestic or international shipment of goods by land, air or sea. The Policy's signature block stated that it was "issued in Philadelphia," and the document incorporated Pennsylvania's Statute of Limitations as its guideline for timely suit.

---

**1.** In March 2004, Merck moved to amend its original Answer and Counterclaims. Merck's motion is currently fully briefed and *sub judice* before Magistrate Judge Francis, and proposes several material changes to the original Answer, including the deletion of Merck's common law fraud claim against American Home. For purposes of this decision only, the Court continues to include fraud in its summary of the Merck counterclaims pending resolution of Merck's proposal by Magistrate Judge Francis.

**2.** Though neither Aon nor AIMA are parties to this suit, both were closely involved in the Policy's creation, and both have been identified as essential witnesses to the dispute.

Following its execution, the original Policy was first sent to Aon's Philadelphia office and then forwarded to Merck's New Jersey headquarters. . From then on, the Aon Philadelphia office managed Merck's premium payments (Aon forwarded payments to New York at the conclusion of its own Merck billing cycle), while the bulk of Merck's claims and adjustments were processed by a third-party adjuster (AI Marine) in New York.

Between July 2000 and March 2003, Merck submitted several claims for payment under the Policy. During that period, American Home rejected payment of 35 of these claims. American Home informed Merck, and this Court in connection with this litigation, that these refusals were prompted directly by Merck's failure to provide accurate proof of the damage involved and to accurately segregate damaged product from salvageable material, as required by the Policy. The total value of these 35 [3] contested claims is approximately $18 million.

Following its decision not to reimburse the contested losses, American Home filed the complaint in the instant action requesting a declaratory judgment confirming its right to withhold payment. Merck responded with sixteen counterclaims, alleging breach of contract, negligence, fraud and breach of fiduciary duty, bad faith conduct and violation of the New York Consumer Protection From Deceptive Acts and Practices Act. Merck seeks a declaratory judgment obligating American Home to pay for the remaining, outstanding product losses.

## B. *THE INSTANT MOTIONS*

Pursuant to Fed.R.Civ.P. 9(h), American Home identified its suit as an admiralty action properly before this Court under 28 U.S.C. § 1333. Merck has filed a motion contesting American Home's statement of jurisdiction. Merck contends that the Policy is not a maritime contract, and that Merck's coverage under the Policy is completely attenuated from the business of maritime commerce. Merck now moves the Court to dismiss American Home's complaint for lack of admiralty jurisdiction, or alternatively to grant partial summary judgment on the issue of admiralty jurisdiction alone. Notwithstanding this motion, Merck concedes that the case may properly be brought before the Court under diversity jurisdiction: American Home is a New York corporation with its principal place of business in New York and Merck is a New Jersey corporation with its principal place of business in New Jersey.

Ultimately, the source of the Court's jurisdiction over this case will control the parties' right to a jury, should the matter proceed to trial. In short, admiralty cases are customarily tried to the Court without a jury, *see* Fed.R.Civ.P. 38(e), *Fitzgerald v. U.S. Lines Co.*, 374 U.S. 16, 20, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963), while in a diversity action the parties are entitled to a jury trial should they so demand.

In a separate motion, American Home seeks partial summary judgment on the issue of choice of law. American Home contends that, given the Policy's substantial contacts with the State of New York, New York State law must govern the Policy, regardless of whether the interpreting court sits in admiralty or diversity jurisdiction. Merck counters that the Policy's language dictates that Pennsylvania law applies to any claims arising under it. In addition, Merck argues that the Policy was signed and executed by sophisticated par-

---

**3.** Two of the original 35 claims at issue related to sea-based shipments, but Merck has since withdrawn those claims and decided not to pursue their payment by American Home.

ties familiar with the legal significance of its language and may not now be reinterpreted to provide New York law as controlling.

## II.  DISCUSSION

### A.  STANDARD OF REVIEW

"Summary judgment is appropriate where 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law,' i.e., 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Lovejoy–Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir.2001) (quoting Fed. R.Civ.P. 56(c) and Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In evaluating a motion for summary judgment, the Court must construe all available evidence in favor of the non-moving party, and draw all reasonable inferences on its behalf. See World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 165–66 (2d Cir.2003).

### B.  JURISDICTION

American Home attempts to frame this litigation as arising under the Court's admiralty jurisdiction. Because neither side disputes the existence of complete diversity between the parties, the Court will retain jurisdiction over the case on some basis regardless of its resolution of American Home's motion. For purposes of this case, the only substantive difference between admiralty and diversity jurisdiction is the availability of a jury trial.

"Admiralty jurisdiction was created to provide a neutral federal forum and a uniform body of law to adjudicate rights and liabilities as they related to the trafficking of seafaring vessels." See Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, 968 F.2d 196, 199–200 (2d Cir.1992) (citing Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 13, 20 L.Ed. 90 (1870); Benedict on Admiralty, § 182 (1992)). In effect, "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce," id., at 200 (citing Sisson v. Ruby, 497 U.S. 358, 367, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)). Any court evaluating the existence of such jurisdiction must consider "whether the subject matter of the dispute is so attenuated from the business of maritime commerce that is does not implicate the concerns underlying ... maritime jurisdiction." Id.

American Home advances several theories in support of its argument that admiralty jurisdiction is proper. First, it notes that two of the shipments giving rise to Merck's claim for coverage were made by seaborne vessels. Second, it asserts that the Policy was primarily intended to cover maritime interests. Third, it points to preliminary evaluations of the marine market prepared during the Policy's negotiation, as well as the marine nature of AIMA's business, as indicators of an essentially maritime transaction. Finally, American Home argues that the employment of transport aircraft performing transoceanic crossings creates a nexus with traditional maritime activity that is sufficient to justify admiralty jurisdiction over related claims. These contentions suffer from several flaws.

Of the 35 claims at issue in this litigation, only two relate directly to sea-based shipments (counts 1 and 2 of the Second Amended Complaint). These two counts have been rendered moot by Merck's decision not to pursue reimbursement for those shipments from American Home. Because Merck has declined to seek indemnity for the losses incurred through those two shipments, American Home's claims as to liability for those losses no

longer present a justiciable controversy. It is well settled that "the existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction." *Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 631 (S.D.N.Y.2003); *see also Certain Underwriters at Lloyd's London v. St. Joe Minerals Corp.,* 90 F.3d 671, 675 (2d Cir. 1996) ("in the absence of an 'actual controversy,' a district court is without power to grant declaratory relief"). Accordingly, the Court regards this portion of American Home's complaint as effectively dismissed.

American Home's broader allegation that the Policy has a maritime focus is equally unfounded. To support its characterization of the Policy as a maritime agreement, American Home refers to several Policy clauses that are typical of a marine contract,[4] and emphasizes that AIMA has historically engaged in business of a "marine nature." Neither of these details create a distinctly maritime contract, and the generalized, non-maritime scope of the Policy's coverage undermines any such claim. Notably, American Home fails to cite any precedent suggesting that these details alone are sufficient to invoke admiralty jurisdiction over the decidedly neutral contract the parties produced.

In the end, American Home's claim to admiralty jurisdiction relies on an analogy between transoceanic airborne freightage and traditional ship-based maritime activity. American Home argues that where an aircraft performs a function traditionally accomplished by waterborne vessels (for example, a "transoceanic crossing"), that aircraft's flight constitutes maritime activity, and is sufficient to invoke admiralty jurisdiction over a related claim. Neither the principles of admiralty jurisdiction discussed above nor the relevant contract jurisprudence supports such a flight of fancy.

In its attempt to connect airborne shipments to maritime commerce, American Home cites three cases for the proposition that an aircraft may constitute a marine vessel. *See Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972); *Preston v. Frantz,* 11 F.3d 357 (2d Cir.1993); *Hammill v. Olympic Airways, S.A.,* 398 F.Supp. 829 (D.D.C.1975). Those precedents are not persuasive for several reasons.

First, the cases cited all involve aviation *tort* claims, which courts have historically treated differently, with regard to jurisdiction, from claims in contract. Specifically, the Supreme Court has explained that a determination of whether there is admiralty jurisdiction over a particular tort or class of torts should rely on the relationship of the wrong to "traditional maritime activity," *see Executive Jet,* 409 U.S. at 261, 93 S.Ct. 493, while admiralty jurisdiction over contract claims is assessed according to the nature of the contract at issue. In *The Belfast,* the Court described the distinction as follows:

> Contracts, claims, or service, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in the admiralty [courts].... Torts or injuries committed on navigable waters, of a civil nature, are also cognizable in the admiralty courts. Jurisdiction in the former case depends upon the nature of the contract, but in the latter it depends entirely upon locality.

74 U.S. (7 Wall.) 624, 637, 19 L.Ed. 266 (1868).[5]

---

**4.** American Home cites several traditional maritime clauses in the Policy to support this proposition, *e.g.,* the Inchmaree Clause, the Shore Clause and the Craft Clause.

**5.** *See also* Schoenbaum, Thomas J., *Admiralty*

■ In other words, unlike tort doctrine, the availability of admiralty jurisdiction over a contract dispute derives not from the circumstances surrounding an alleged breach and attendant injury, but instead from whether the relevant contractual relationship embodied in the parties' agreement incorporates a uniquely maritime concern. *See American Nat'l Fire Ins. Co. v. Mirasco, Inc.*, No. 99 Civ. 12405, 2000 WL 1368009 at *4–5 (S.D.N.Y. Sept.20, 2000) ("Admiralty jurisdiction includes all contracts which relate to the navigation, business, or commerce of the sea.... If the concerns underlying admiralty jurisdiction are implicated and the dispute is contractual ... the court must then determine *whether the contract is maritime in nature.*") (internal quotation marks omitted, emphasis added). By relying entirely on cases that discuss a very different avenue to the jurisdiction sought, American Home provides no support for its contention that an airborne shipping component by itself has rendered this Policy sufficiently maritime in nature to warrant invoking the Court's admiralty jurisdiction.

■ Second, the central decision on which American Home relies, *Executive Jet,* emphasizes that federal courts have expressly declined to characterize airplanes as maritime vessels in a wide variety of circumstances, and that the connection of aircraft to traditional maritime activity is merely a *hypothetical* possibility within the field of admiralty tort. *See* 409 U.S. at 261–63, 93 S.Ct. 493. In other words, contrary to American Home's allegation, the concept of an aircraft operating in lieu of a waterborne vessel, and thereby establishing admiralty jurisdiction

over its governing contract, is far from well-established.

Finally, American Home fails to indicate a single case involving the shipment of freight, and points exclusively to a series of cases relating to downed aircraft, without any explanation of how such occurrences relate to the instant dispute. American Home has offered no indication that the disputed damage was actually sustained over water, and ultimately fails to adequately connect the idea of an aircraft's capacity for transoceanic flight to the specific claims at issue.

Putting aside what is, at best, a tenuous connection of the underlying events to the sea, the Court must now apply the actual, prevailing test for admiralty jurisdiction. To do so, it asks: is the Policy sufficiently maritime in nature to constitute a contract in admiralty? The Court concludes that it is not. Specifically, the Court notes that (1) the language in several key coverage provisions ("Geographical Limits," "Conveyances," and "All Risk") refers to transit in *any* form, be it land, air *or* water-based; (2) the risk insured against—worldwide, in-transit damage to pharmaceutical products and supplies—is in no way unique to a maritime setting or marine danger; and (3) unlike the claim at issue in *Americas Ins. Co. v. J. Aron & Co.*, No. 93 Civ. 2503, 1994 WL 172407 (S.D.N.Y. May 4, 1994), cited by American Home as precedent, the Policy was not primarily focused on transportation by sea, and there is no evidence that the insured losses accrued in the midst of an extended maritime journey.

Given the absence of any justiciable controversy involving a seaborne shipment,

*and Maritime Law* § 3–10 (4th ed. 2004) ("[A]s to *contracts,* it has been well settled that the English rule which conceded jurisdiction ... only to contracts made upon the sea and to be executed thereon [making *locality*

the test] is entirely inadmissible, and that the true criterion is the nature and subject matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions.")

the generalized, non-maritime nature of the Policy, and the inapplicability of comparable tort law standards, the Court finds no ground to support exercise of admiralty jurisdiction over this dispute. Accordingly, the case will proceed as a diversity action.

## C. CHOICE OF LAW

American Home argues that New York State law should govern the parties' rights and liabilities under the Policy. Merck counters that the Policy's explicit, unambiguous references to Pennsylvania indicate Pennsylvania law as controlling.

■ Because this Court is sitting in diversity, it will use the choice of law rules of its forum state, New York, to determine the applicable law. *See Guaranty Trust Co. of New York v. York,* 326 U.S. 99, 108–09, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945).

The first step in any choice of law inquiry is to determine whether there is an actual conflict between the laws invoked by the parties. *See In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Laws are in conflict "where the applicable law from each jurisdiction provides different substantive rules." *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998). In this case, Pennsylvania and New York law differ as to the remedies that they attach to Merck's counterclaim for bad faith. Consequently, the Court must identify the source of governing law for this action.

■ When addressing a conflict of contract laws, New York courts first identify the contract's "center of gravity" or "grouping of contacts," *see Maryland Cas. Co. v. Cont'l Cas. Co.,* 332 F.3d 145, 151 (2d Cir.2003) (citing *Auten v. Auten,* 308 N.Y. 155, 160, 124 N.E.2d 99 (1954)), and then apply "the law of the place which has the most significant contacts with the matter in dispute." *Id.* In practice, this test considers a variety of contract details. Specifically, the New York Court of Appeals has identified five factors relevant to determine which state has the "most significant relationship" to a contract dispute: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile or place of business of the contracting parties. *Maryland Cas. Co.,* 332 F.3d at 151–52 (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1068 (1994)). Among these criteria, the traditional choice of law factors—the places of contracting and performance—receive the heaviest weight in a court's analysis. *See Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1539 (2d Cir.1997) (citing *In re Allstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936, 939 (1993)).

With New York's standard in mind, the Court looks first at the Policy itself. The Policy contains explicit references to Pennsylvania law. Its signature page states that "this policy is issued in Philadelphia," and its "Suits" clause names the Pennsylvania Statute of Limitations as the operating deadline for related claims. The Policy contains no references to New York or to any state other than Pennsylvania. American Home argues that the significance of the Policy's "issued in" clause is negated by the fact that the final contract was merely a revised version of Aon's manuscript form policy. Essentially, American Home suggests that the parties' failure to replace "issued in Philadelphia" with a clause indicating New York was a "typographical error" that should not dictate this Court's decision on choice of law. Several established principles of contract

construction prevent the Court from deferring to such revisionism.

As a general rule, the Court may not reinvent an obviously straightforward contract clause that was signed and executed by two sophisticated parties. *See, e.g., Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case.") (internal citations omitted). Where a "contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *See RJE Corp. v. Northville Industries Corp.,* 329 F.3d 310, 314 (2d Cir.2003) (quoting *De Luca v. De Luca,* 300 A.D.2d 342, 342, 751 N.Y.S.2d 766 (2d Dept.2002)). Simply put, parol evidence, like the testimony cited by American Home to explain what it characterizes as the "issued in" oversight, may not be used to change the wording of a written contract that is clear on its face, *see CTI–Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 381–82 (2d Cir.1982), or to "create an ambiguity where none exists," *Hanam, B.V. v. Kittay,* 589 F.Supp. 1042, 1047 (S.D.N.Y. 1984).

Courts have made clear that exceptions to this rule, in the form of contract reformation, are reserved for specific circumstances involving either mutual mistake or fraud.[6] Under New York law, reformation may be granted in only two circumstances: where there has been (1) a mutual mistake, or (2) unilateral mistake coupled with fraudulent concealment by the knowing party. *See Winmar Co., Inc. v. Teachers Ins. and Annuity Ass'n of America,* 870 F.Supp. 524, 535 (S.D.N.Y.1994) (citing *Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986)). Merck has never agreed or conceded that the clause's inclusion constituted a mutual mistake, and American Home makes no allegation of a fraudulently induced unilateral mistake. Consequently, the Court sees no reason to disregard the Policy's clear statement, appearing directly above the signature line, that it was issued in Philadelphia, Pennsylvania.

American Home also emphasizes that the Policy was solicited, drafted and executed in New York. American Home notes that the parties conducted regular meetings in New York throughout their year 2000 negotiations, and that the final binding signatures by American Home were executed in their New York office. American Home further remarks that Merck's premium payments were all directed to AIMA's New York office, and that the bulk of Merck's adjusted payments came from a New York-based adjuster (AI Marine). These details, however, are insufficient to outweigh the Policy's plain textual links to Pennsylvania.

In sum, the Court must apply New York State's center-of-gravity test to determine an appropriate choice of law, and here, the result is clear: the Policy's own language locates the contract in Pennsylvania. Though each party has presented extensive anecdotal evidence intended to emphasize one state over the other, three

---

**6.** Procedurally, there is a "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties, so that the proponent of reformation must show in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon by the parties." *Backer Mgt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062, 1066 (1978).

important aspects of the Policy remain undisputed: (1) the location of the risk covered is essentially worldwide (coverage extends to both domestic and international shipments between multiple Merck locations throughout the globe), (2) the Policy's only state-specific term is a Pennsylvania Statute of Limitations in its "Suits" clause, and (3) the document's signature block expressly states that the Policy was issued in Pennsylvania. Given the significance accorded to place of contract by New York's choice of law rules, and the absence of a specific geographical focus for the coverage itself, these details are determinative. Accordingly, American Home's motion for partial summary judgment on the issue of choice of law is denied, and a declaratory judgment identifying Pennsylvania law as the controlling standard is granted in response.

### III. *ORDER*

For the stated reasons, it is hereby

**ORDERED** that the motion of defendant Merck & Co. Inc. for partial summary judgment as to the inapplicability of admiralty jurisdiction to the action by plaintiff American Home Assurance Company is granted; and it is further

**ORDERED** that the case will proceed before this Court in diversity jurisdiction; and it is further

**ORDERED** that Pennsylvania law will govern the litigation involving the contract before this Court.

**SO ORDERED.**