**F.H. BERTLING HOLDING KG, Plaintiff,**

v.

**RANHILL ENGINEERS AND CONSTRUCTORS SDN. BHD., Defendant.**

No. 08 Civ. 2003(SAS).

United States District Court, S.D. New York.

July 9, 2008.

**378**

William E. Lakis, Esq., DeOrchis & Partners, LLP, New York, NY, for Plaintiff.

Shaun F. Carroll, Esq., Nourse & Bowles, LLP, New York, NY, for Defendant.

### OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

On February 28, 2008, this court granted an *ex parte* order attaching the assets of defendant Ranhill Engineers and Constructors Sdn. Bhd. ("REC"). REC now moves to vacate that attachment. For the following reasons, the order of attachment is vacated.

## II. BACKGROUND

### A. The Logistics Agreement

On July 27, 2006, F.H. Bertling Holding KG ("Bertling"), a German holding company, and REC, a Malaysian construction company, entered into a Logistics Agreement that applied to three of REC's upcoming construction projects, including a 20,000 unit residential development in Libya.[1] The stated purpose of the agreement was "to set out general terms and conditions"[2] under which Bertling was "to undertake logistics services for certain [of REC's Engineering, Procurement, Construction, and Commissioning] projects."[3] Once REC or an affiliated company secured a final contract award for one of the three projects, Bertling would "effectively become REC's subcontractor for the Services required for the Project and . . . employ various other parties on a Sub Sub Contract basis" in order to fully meet REC's logistical needs.[4]

Because the Agreement was entered into in advance of REC initiating work on any of the projects, the parties enumerated the anticipated general scope of Bertling's services. In general, Bertling was to "provide door to door freight forwarding services and any logistics related works," and "provide REC with the most suitable and cost effective proposal serving the purpose of the project."[5] An appendix to the Agreement included a more detailed list of Bertling's anticipated duties. Several of these were related to ocean shipping, such as "door to door freight forwarding of sea/air/truck/rail shipments wherever applicable," "sea and air charters," and "preparation of marine cargo stowage planning."[6] The Agreement also listed several anticipated land-based tasks, including "manpower mobilization," "road surveys," "warehousing if required by REC," and "participation in vendor and supplier meetings to the extent required by REC."[7] Additionally, the Agreement

---

1. *See* Logistics Agreement, Ex. A to Declaration of Jorg Blumberg, Chief Financial Officer of F.H. Bertling Holding KG ("Blumberg Decl."), at Appendix 1.

2. *Id.* ¶ 1.

3. *Id.* ¶ B.

4. *Id.* ¶ 1.

5. *Id.* ¶ 2.

6. *Id.* at Appendix 2.

7. *Id.*

reserved REC's right to "procure materials and equipment from suppliers, vendors or the like on a [cost, insurance, and freight basis][8] or any other basis it considers is in the best interest of REC."[9] A subsequent letter sent by REC's Chief Executive Officer to Bertling after the Libyan housing project had commenced confirmed both parties' understanding that under the terms of the Agreement, Bertling was the "sole and exclusive representative for all logistic services required by REC for the [Libyan housing project]."[10]

The Agreement provided for payment to Bertling on a cost-plus basis; the "cost" portion being the net costs to Bertling of the sub sub contracts, along with a monthly management fee, and the "plus" portion being 10% of those net costs.[11] The Agreement also required REC to pay a "Special Advance Payment" of $2,341,245.16, which represented the settlement of a previous debt that REC owed to Bertling.[12] The Agreement included a clause stipulating that the "Agreement constitutes the entire agreement between the Parties and supersedes all prior oral or written representations between the Parties."[13] The Agreement also stipulates that all disputes that cannot be resolved amicably between the parties shall be settled by an arbitrator in Malaysia, and that the laws of Malaysia govern the Agreement.[14]

## B. The Libyan Housing Project

In December 2005, the Libyan government awarded Amona Africa Construction ("AAC"), which was then unaffiliated with REC, the right to build between ten thousand and twenty thousand housing units in Libya.[15] Subsequently, AAC contracted the engineering, procurement, and construction tasks to REC's parent company, Ranhill Berhad.[16] In January 2006, Ranhill Berhad purchased a sixty percent interest in AAC, creating a company called Amona Ranhill Consortium ("ARC").[17] According to REC, ARC was a distinct company from REC and REC had no authority to enter into contracts on ARC's behalf,[18] though ARC at times utilized REC employees.[19]

By July 2006, ARC had not signed the final contract with the Libyan government,

---

8. Cost, insurance, and freight is a contract term, used only when goods are to be shipped by sea or inland waterway, that obligates the seller to 1) clear the goods for export, 2) arrange for transportation by water, 3) procure insurance against the buyer's risk of damage during carriage, and 4) pay the costs of shipping to the port of destination. *See Black's Law Dictionary* 373 (8th ed. 2004).

9. Logistics Agreement ¶ 2.

10. 9/6/06 Letter From Ron Metcalf, Chief Executive Officer of REC, Ex. F to Blumberg Decl., at 1.

11. *See* Logistics Agreement ¶ 9.

12. *Id.* ¶ 10. *See also* 7/7/06 Final Settlement Agreement for Off-Shore Services, Ex. A-1 to Blumberg Decl. at 1.

13. *Id.* ¶ 15.

14. *See id.* ¶¶ 13-14.

15. *See* 5/29/08 Unsworn Declaration of Ronald Metcalf, Chief Executive Officer of Ranhill Engineers and Constructors Sdn. Bhd. ("Metcalf Decl.") ¶ 16.

16. *See id.*

17. *See id.*

18. *See id.* ¶ 9. Bertling maintains that ARC and REC were affiliated and alleges that "Mr. Metcalf and company of REC (sic) exercised apparent control over ARC when it suited them." 6/13/08 Sur-Reply Declaration of Jorg Blumberg ("Blumberg Sur-Reply Decl.") ¶¶ 3-5.

19. *See* Metcalf Decl. ¶ 10.

but REC anticipated that ARC would secure the final construction contract and then subcontract the engineering work to either REC or another subsidiary of Ranhill Berhad.[20] At the time the Logistics Agreement was signed on July 27, 2006, both parties assumed that most of the materials and equipment needed for the project would be shipped by sea.[21]

Contrary to REC's initial assumption, ARC did not subcontract its engineering work after securing a final contract from the Libyan government.[22] REC maintains that because ARC never awarded it any subcontract, and because ARC is not affiliated with REC, REC never secured the Libyan housing contract and thus the Logistics Agreement did not take effect with respect to that project.[23] Bertling, on the other hand, maintains that ARC and REC were not only affiliated, but acted as a single company, and thus ARC and REC were bound to the Logistics Agreement,[24] which applies to "REC and/or its affiliates."[25]

After ARC secured the contract for the Libyan Housing project, Bertling undertook some logistics work in support of the project.[26] The parties dispute the circumstances surrounding Bertling's logistical work for ARC. Bertling claims that it was bound to perform the work under the terms of the Logistics Agreement,[27] while REC claims that it and ARC chose to give Bertling "some of the benefit of the Logistics contract ... to keep the relationship [between Ranhill and Bertling] going." [28] In any event, Bertling's work for ARC did not involve as much overseas shipping as Bertling had anticipated. Contrary to REC's and Bertling's mutual understanding at the time they signed the Logistics Agreement, ARC decided to buy most of its materials and equipment locally, sharply reducing the need for ocean shipping.[29] Additionally, while Bertling has provided some ocean shipping to REC and ARC under the terms of the Logistics Agreement for all three of the listed construction projects, Bertling itself concedes that "the bulk of the shipments for which [Bertling] provided services involved air freight instead of sea freight." [30]

**20.** *See id.* ¶ 8.

**21.** *See id.* ¶ 16 ("[I]t was initially thought [that] a good deal of material would have to be imported ... and the port and shipping related facilities in and around the project site in Libya were actively investigated."); Blumberg Decl. ¶ 6 ("It was agreed that the primary mode of Logistics would be ocean transportation of goods, materials and equipment that would be used by REC and its affiliates in connection with the Libyan Housing Project.").

**22.** *See* Metcalf Decl. ¶ 10.

**23.** *See id.* ("[T]he Libyan project was not awarded to REC and the primary factual precondition for REC's contract with Bertling Holdings under the July 27, 2006 Logistics Agreement failed to occur.").

**24.** *See* Blumberg Sur–Reply Decl. ¶ 7.

**25.** Logistics Agreement ¶ A.

**26.** *See* 5/14/08 Declaration of Folker Lehning, Project Director of F.H. Bertling Logistics GmbH ¶¶ 3–8.

**27.** *See* Blumberg Decl. ¶ 17. *See also* 5/18/07 Letter from Ron Metcalf to Jorg Blumberg, Ex. G to Blumberg Decl. at 1 ("We refer to the Logistics Agreement dated 27 July 2006 .... [W]e confirm [that] you are *required* to mobilize Mr. Folker Lehming (sic) as Bertling's Libya Project Logistics Director with effect from 28 May 2007.") (emphasis added).

**28.** Metcalf Decl. ¶ 12.

**29.** *See id.* ¶ 16 ("[A]s ARC has proceeded with their project most of the materials have been sourced in Libya or nearby, and very little ocean transport is needed.").

**30.** Blumberg Decl. ¶ 21.

## C. The Dispute

The dispute underlying Bertling's attachment of REC's funds is based on Bertling's claim that REC and ARC breached the Logistics Agreement by paying neither the special advance payment nor "ocean freight and related charges."[31] Bertling is suing for those costs, as well as lost profits based on Bertling's understanding that it would be the exclusive provider of logistical support and ocean shipping.[32]

## III. LEGAL STANDARD

Supplemental Rules B and E of the Federal Rules of Civil Procedure govern attachment of assets in maritime actions.[33] If the defendant is not present within a district, Rule B allows for the attachment of the defendant's assets up to the amount the plaintiff is suing for.[34] Rule E entitles the defendant to "a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated."[35] The Second Circuit has held that in addition to meeting the service and filing requirements of Rules B and E, a plaintiff seeking to show why an attachment should not be vacated must show that "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district;

3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment."[36] "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rules B and E."[37]

"[T]he majority of courts in this district have held that the standard for determining whether a plaintiff has asserted a 'valid prima facie admiralty claim' is the 'prima facie standard,' rather than the more demanding 'fair probability' or 'reasonable grounds' standards."[38] While there is some division within this district over the question of what constitutes a "valid prima facie admiralty claim,"[39] there seems to be little disagreement that the "inquiry focuses on whether the plaintiff has [pled] a claim cognizable in admiralty."[40]

## IV. APPLICABLE LAW

### A. Maritime Jurisdiction Stemming from Maritime Contracts

■ Federal courts may exercise their maritime jurisdiction granted by section 1333 of title 28 of the United States Code if an action is based on a maritime contract.[41] There are few "clean lines

---

31. Complaint ¶¶ 16, 20.

32. *See id.* ¶¶ 12–29.

33. *See* Fed.R.Civ.P. Supp. Rules B, E.

34. *See* Fed.R.Civ.P. Supp. Rule B(1)(a).

35. Fed.R.Civ.P. Supp. Rule E(4)(f).

36. *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty., Ltd.*, 460 F.3d 434, 445 (2d Cir.2006).

37. *Id.*, n. 5.

38. *Padre Shipping, Inc. v. Yong He Shipping*, 553 F.Supp.2d 328, 331–32 (S.D.N.Y.2008) (citing *Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F.Supp.2d 261, 266 (S.D.N.Y.2007)).

39. *See id.* (noting that some cases within the district have held that the admiralty claim "must be valid under the substantive law that will govern the underlying action," while other cases have held that the plaintiff satisfies the prima facie standard if "the complaint merely demonstrates that the plaintiff has a claim that is cognizable in admiralty." (quotation marks and citations omitted)).

40. *Ronda Ship Mgmt. v. Doha Asian Games Org. Comm.*, 511 F.Supp.2d 399, 404 (S.D.N.Y.2007).

41. *See Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (a federal action can "be sustained under the admiralty jurisdiction by virtue of the maritime contracts involved.").

between maritime and non-maritime contracts,"[42] and the true criterion of exercising jurisdiction over a maritime contract is whether the contract's nature and character make reference to maritime service or maritime transactions.[43] The examination of the maritime character of a contract is "conceptual rather than spatial, and defined by the purpose of the jurisdictional grant—to protect maritime commerce."[44] "The contract's subject matter must be [the] focal point."[45] Accordingly, courts may not examine potential maritime contracts by "depend[ing] solely on geography."[46]

## B. Threshold Inquiry

Prior to the Supreme Court's ruling in *Norfolk Southern Railway Co. v. Kirby*,[47] the Second Circuit required a threshold inquiry as to " 'whether an issue related to maritime interests has been raised.' "[48] The *Kirby* decision, however, made no mention of such a threshold inquiry, casting some doubt as to whether the threshold inquiry is still required.[49] The Second Circuit has not yet directly answered this question, and has "simply highlight[ed] this discrepancy and le[ft] for a more appropriate case the question of how [*Kirby* ] might circumscribe our 'threshold inquiry' doctrine, if at all.' "[50]

■ The threshold inquiry examines the subject matter of a dispute, as opposed to the underlying contract,[51] to determine if " 'an issue related to maritime interests has been raised.' "[52] A dispute will not give rise to maritime jurisdiction if " 'the subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction.' "[53] The Second Circuit has only encountered two cases, both involving insurance claims for coffee lost from a warehouse, where the dispute did not meet this threshold inquiry and thus did not fall within federal maritime jurisdiction.[54] Though the insurance policy in these cases covered cargo "during land transport and warehousing, as well as during ocean carriage,"[55] the Second Circuit found the dispute too attenuated from

---

42. *Id.*

43. *See id.* at 24, 125 S.Ct. 385.

44. *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005) (citations omitted).

45. *Id.* at 312 (citing *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991)).

46. *Kirby*, 543 U.S. at 27, 125 S.Ct. 385.

47. 543 U.S. 14, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

48. *Folksamerica*, 413 F.3d at 312 (quoting *Atlantic Mut. Ins. v. Balfour Maclaine Int'l Ltd.* (*Atlantic Mutual* ), 968 F.2d 196, 199 (2d Cir.1992)).

49. *See id.* at 313–14.

50. *Id.* at 314. *See also A.P. Moller–Maersk A/S v. Ocean Express Miami*, 550 F.Supp.2d 454, 461 (S.D.N.Y.2008) (recognizing the uncertain status of the threshold inquiry before applying the inquiry).

51. *See Folksamerica*, 413 F.3d at 312 ("[P]rior to inquiring into the subject matter of the contract, we first make a threshold inquiry into the subject matter of the *dispute*." ) (quotation marks omitted).

52. *Id.* (quoting *Atlantic Mutual*, 968 F.2d at 199).

53. *Id.* (quoting *Atlantic Mutual*, 968 F.2d at 200).

54. *See id.* (citing *Atlantic Mut. Ins. v. Balfour MacLaine Int'l Ltd. (In re Balfour MacLaine Int'l Ltd.)* ("*Balfour* "), 85 F.3d 68 (2d Cir. 1996); *Atlantic Mutual*, 968 F.2d 196).

55. *Id.* (quotation marks omitted).

maritime commerce to support federal jurisdiction because the subject matter of the dispute—coffee—had no inherent maritime character, was never designated for ocean transport, and never entered maritime commerce.[56]

### C. Maritime Jurisdiction Over "Mixed" Maritime Contracts

■ Traditionally, only " 'contracts, claims, and services *purely* maritime' " were covered by federal maritime jurisdiction.[57] Two exceptions to this rule allow maritime jurisdiction over contracts that combine both maritime and non-maritime elements: *first*, if the maritime elements of a contract are the principal or primary objective of the contract,[58] and *second*, if " 'the claim arises from a breach of maritime obligations that are severable from the non-maritime obligations of the contract.' "[59]

### 1. The Principal Objective Exception

■ Before *Kirby*, federal courts exercised maritime jurisdiction over mixed land and sea shipping contracts if "the non-maritime elements of a contract [were] 'merely incidental' to the maritime ones."[60] The Supreme Court recently altered this analysis, finding that it is "imprecise to describe the land carriage required by an intermodal transportation contract as 'incidental'; realistically, each leg of the journey is essential to accomplishing the contract's purpose."[61] The Second Circuit, in turn, has read this language to endorse a conceptual approach to mixed maritime and non-maritime shipping contracts, where "[t]he important question ... should be whether the shipment contract's 'primary objective is to accomplish the transportation of goods by sea.' "[62] "Our 'incidental' exception then might more accurately be termed the primary or principal objective exception."[63] "[S]o long as a bill of lading requires substantial carriage of goods by sea, its purpose is to effectuate maritime commerce—and thus it is a maritime contract .... If a bill's *sea* components are insubstantial, then the bill is not a maritime contract."[64] Neither clauses that are "typical of a maritime contract," nor a party's past history of maritime business are sufficient to create a principal maritime objective in an otherwise non-maritime contract.[65] Similarly, air shipping cannot be analogized to ocean shipping to grant maritime jurisdiction, even when the air shipping involves a transoceanic leg.[66]

**56.** *See id.* at 312–13.

**57.** *Id.* at 314 (quoting *Sirius Ins. (UK) v. Collins* 16 F.3d 34, 36 (2d Cir.1994)) (citation omitted).

**58.** *Id.* at 315.

**59.** *Id.* at 314 (quoting *Hartford Fire Ins. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 555 (2d Cir.2000)).

**60.** *Id.* (quoting *Transatlantic Marine Claims Agency v. Ace Shipping Corp.,* 109 F.3d 105, 109 (2d Cir.1997)).

**61.** *Kirby,* 543 U.S. at 26–27, 125 S.Ct. 385.

**62.** *Folksamerica,* 413 F.3d at 314 (quoting *Kirby,* 543 U.S. at 24, 125 S.Ct. 385).

**63.** *Id.* at 315.

**64.** *Kirby,* 543 U.S. at 27, 125 S.Ct. 385.

**65.** *American Home Assurance Co. v. Merck & Co.,* 329 F.Supp.2d 436, 442 (S.D.N.Y.2004) (holding that an insurance policy covering worldwide, in-transit damage to pharmaceutical products did not support maritime jurisdiction because clauses referred to transit in any form, the risk insured against was not uniquely maritime in nature, and the policy was not primarily focused on sea transportation).

**66.** *See id.* at 441–42 ("American Home's claim to admiralty jurisdiction relies on an analogy between transoceanic airborne freightage and traditional ship-based mari-

## 2. Severability

The second exception allows for maritime jurisdiction over a contract containing maritime and non-maritime obligations if the maritime obligations can be separately enforced,[67] and the dispute concerns a breach of those maritime obligations.[68] Contracts or bills of lading that list only one charge for combined land and sea shipping, as opposed to itemizing the cost of the oceanic legs, are not severable.[69] In addition, courts have declined to sever mixed contracts when the land-based obligations are substantial or the claim of breach involves both the land and sea obligations.[70]

## V. DISCUSSION

Of the four elements required by Supplemental Rule B, only the first, the existence of a prima facie admiralty claim, is at issue here. Pursuant to the Logistics Agreement, the underlying dispute is to be settled by arbitration in Malaysia.

## A. The Dispute Satisfies the Threshold Inquiry

Assuming that this circuit's threshold inquiry survives the Supreme Court's decision in *Kirby*, the nature of the dispute is sufficiently connected to maritime commerce to pass the threshold. Unlike the

dispute in *Atlantic Mutual* and *Balfour*, in which coffee that was never transported by sea was too attenuated from maritime commerce to support federal jurisdiction, Bertling's claim for unpaid ocean freight charges directly involves maritime commerce. The purpose of the threshold inquiry is to allow federal jurisdiction over those disputes that implicate the protection of maritime commerce. Claims for unpaid ocean shipping charges certainly fall into that category, and assuming that the threshold inquiry is still an element of the maritime jurisdiction analysis, Bertling's claim survives the inquiry.

## B. The Logistics Agreement Is Not a Maritime Contract

█ Though the dispute implicates maritime commerce, the Logistics Agreement is not a maritime contract and therefore does not support federal maritime jurisdiction. Because the Agreement contemplates land-based obligations as well as ocean-based ones, it is not a purely maritime contract, and can only support maritime jurisdiction if it falls under the principal purpose or severability exceptions. Bertling has not met its burden of proof in showing that the Agreement falls under either exception.

---

time activity. . . . Neither the principles of admiralty jurisdiction . . . nor the relevant contract jurisprudence supports such a flight of fancy.").

**67.** *See Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir.1927) ("[I]n so far as the maritime obligations may . . . be separately adjudicated, there is no objection to the jurisdiction of the admiralty *pro tanto* ").

**68.** *See Hartford Fire Ins. v. Orient Overseas Containers Lines (UK)*, 230 F.3d 549, 555 (2d Cir.2000).

**69.** *See Atlantic Mut. Ins. v. Balfour Maclaine Int'l*, 775 F.Supp. 101, 105 (S.D.N.Y.1991), *aff'd*, 968 F.2d 196 (2d Cir.1992) (citing *Alaska Barge & Transport, Inc. v. United States*, 179 Ct.Cl. 216, 373 F.2d 967, 972 (1967)). *See also Capital Yacht Club v. Vessel Aviva*, 409 F.Supp.2d 1, 9 (D.D.C.2006) ("When both land and sea services fall under one bill of lading in a maritime contract, the contract is nonseverable." (citing *Berkshire Fashions, Inc. v. The M.V. Hakusan II*, 954 F.2d 874, 880–81 (3d Cir.1992))).

**70.** *See Atlantic Mutual*, 775 F.Supp. at 105 (citing *Kuehne & Nagel v. Geosource, Inc.*, 874 F.2d 283, 290 (5th Cir.1989)).

The principal purpose of the Logistics Agreement is not primarily maritime. The Agreement is not a bill of lading,[71] nor a contract to transport goods over land or sea, but rather a generalized understanding between Bertling and REC about the tasks that Bertling may be bound to perform. While the Agreement does mention ocean shipping, it does so in the context of "door to door freight forwarding," which, depending on the nature and origin of the goods being transported, might involve little or no ocean transit. If, as was the case in Libya, REC or an affiliate decided to use primarily local materials, the Logistics Agreement binds Bertling to arrange freight forwarding that involves no ocean transport at all. An agreement covering shipping that involves no ocean transport cannot have maritime commerce as its principal purpose.

Further, Bertling's apparently incorrect belief that the Libyan housing project would require a large amount of ocean shipping does not suffice to give the Agreement a principally maritime purpose. Notwithstanding Bertling's belief, the Agreement does not specify the amount or nature of the goods Bertling is to ship, the ports of origin or destination, the dates of shipping, or the shipping rate. Indeed, the Agreement specifically reserves REC's right to transport goods on a cost, insurance, and freight basis, or by "any other basis it considers is in the best interest of REC." Such language indicates that even if REC or an affiliate decided to import all materials from overseas, Bertling might not be in a position to arrange or charge for any of the shipping, oceanic or otherwise. Because the Agreement specifically contemplates a situation in which Bertling is not involved in ocean shipping in any way, it does not have maritime commerce

as its principal purpose. At bottom, the Logistics Agreement memorializes a general understanding that Bertling will provide both land and sea-based logistical support to REC's construction projects, and allows REC the discretion whether or not to use any of Bertling's ocean shipping services. Its principal purpose is not maritime commerce, but rather logistical support for the specified construction projects.

The Logistics Agreement does not fit within the severability exception because it creates no maritime obligations that might be severed from other land-based obligations. Further, because the Agreement lists no allotments or percentages of ocean shipping that Bertling is bound to perform, nor any separate shipping rates or charges, any maritime obligations that the Agreement may have created cannot be cleanly separated from the land-based obligations. Finally, Bertling's complaint includes substantial land-based claims, and its largest claim is for the unpaid special advance payment. This claim, along with the unpaid freight and lost profits stemming from any land freight forwarding obligations Bertling may have been bound to perform, form substantial land-based claims that weigh against severing any potential maritime obligations from the Logistics Agreement.

## VI. CONCLUSION

For the foregoing reasons, defendant's motion to vacate the attachment is granted. Because I find there is no maritime jurisdiction over this case, the Clerk of the Court is directed to close this case.

SO ORDERED.

---

**71.** A bill of lading is "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods." *Black's Law Dictionary* 176 (8th ed. 2004).